IN RE APPLICATION OF SILVEY REFRIGERATED CARRIERS, INC.
SILVEY REFRIGERATED CARRIERS, INC., APPELLANT, V. BEE LINE
MOTOR FREIGHT, INC., ET AL., APPELLEES.
414 N.W.2d 248

Filed October 23, 1987.    No. 85-928.

Marshall D. Becker and Robert M. Cimino, for appellant.

James E. Ryan of Ryan & Williams, P.C., for appellees.

BOSLAUGH, C.J., Pro Tem., WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

BOSLAUGH, C.J., Pro Tem.

Silvey Refrigerated Carriers, Inc., has appealed from the order of the Nebraska Public Service Commission which denied its application for authority to operate as a contract carrier in Nebraska intrastate commerce.

Silvey is currently authorized to operate in interstate commerce from its terminal in Council Bluffs, Iowa. Beginning in February 1985, and continuing for 2 to 3 months, Silvey began furnishing service to Packaging Corporation of America, located in Omaha. Silvey's operations consisted of leaving an empty trailer at Packaging Corporation's loading dock, returning later for the loaded trailer, and leaving another empty trailer for loading. Silvey would then take the loaded trailer to its Council Bluffs terminal overnight and deliver the load to its Nebraska destination the following day. Packaging Corporation stopped shipping with Silvey when it learned that Silvey had no intrastate authority.

On April 24, 1985, Silvey applied for intrastate authority to operate as a contract carrier. Protests were filed by Bee Line Motor Freight, Inc., and Brown Transfer Co. After a hearing on August 14, 1985, the commission entered its order denying Silvey's application.

The commission found that Silvey was fit, willing, and able to properly perform the service; that it had not shown its service was such that it would serve any distinct need of the shippers which was not already being served by common carriers; that the entry of Silvey into the field before obtaining intrastate authority was significantly detrimental to the protestants Bee Line and Brown; and that Silvey's preapplication routine of leaving truckloads overnight in Council Bluffs before delivery to their Nebraska destinations was a subterfuge to evade the Nebraska motor carriers act.

Silvey's numerous assignments of error can be consolidated into three.

Silvey contends that the finding by the commission that its operations prior to the filing of the application were a subterfuge is not supported by the evidence and was erroneous. It is Silvey's position that its business practice of picking up a loaded trailer in Omaha and taking the load to its Council Bluffs terminal, and then transporting the load to its Nebraska destination the next day, falls within its interstate authority, and therefore Silvey is not subject to the jurisdiction of the commission.

Silvey relies on the decision in *Maudlin, Oregon Public Utility Commissioner v. Southwest Delivery Co., Inc.*, 1985 Fed. Carr. Cas. (CCH) ¶ 37,198. In that case, the Oregon public utility commissioner sought to prevent Southwest's activities on the basis that it was involved in Oregon intrastate commerce without proper authority.

Southwest Delivery operated in interstate commerce from its terminal in Vancouver, Washington. As a part of its business, Southwest would handle shipments between Portland, Oregon (located just across the river from Vancouver), and other Oregon destinations. Appellate division 2 of the Interstate Commerce Commission held that Southwest Delivery Co.'s practice of picking up less-than-load (LTL) shipments in

Portland, Oregon, then taking them back to its Vancouver, Washington, headquarters for consolidation with other LTL shipments having prior interstate movement, and delivering the entire load to Oregon destinations, was interstate commerce and not a subterfuge.

The ICC noted that transportation of property by motor vehicle between points in the same state through another state is transportation in interstate commerce regardless of how small the distance traveled in the other state. The ICC also noted that a carrier may not use its interstate operating authority to evade legitimate state regulation of intrastate commerce. Such transportation through another state is beyond the carrier's interstate authority if done in bad faith or as a subterfuge to evade intrastate regulation.

To determine whether bad faith or subterfuge was involved, the ICC looked to the test set out in *Pennsylvania P.U.C. v. Arrow Carrier Corp.*, 113 M.C.C. 213 (1971). The test provides that the ICC and the courts should look to the reasonableness of the carrier's modus operandi, as evidenced by (1) the degree of circuity involved in the interstate route when compared with the "local" route normally employed by intrastate carriers, (2) the presence or absence of economic or operational justification for such routing apart from the carrier's lack of intrastate authority, and (3) the incidental or dominant character of the intrastate traffic as a portion of the carrier's overall operation. The *Arrow* decision also stated that no single factor is controlling as to the outcome.

As to the first issue, of circuity, the ICC found circuity occurred by picking up traffic within the Portland commercial zone, moving it north to the Vancouver terminal, and then moving it southward again to Oregon destinations. However, the ICC concluded that because the Portland-to-Vancouver hauls were within the boundaries of the Portland commercial zone, any circuity was merely an ordinary and routine facet of the business of transporting LTL shipments.

> The commercial zone defines the territory which is "adjacent to, and commercially a part of" a municipality; the commercial zone exemption of 49 U. S. C. 10526(b)(1), and the territorially coextensive terminal area

exemptions of 49 U. S. C. 10523 and implied operating authority under 49 CFR 1041.20, which allowes [sic] carriers to serve points beyond the legal boundaries of specifically authorized municipalities, all exist to enable carriers to serve, in a simple and convenient matter, industries which may be located in suburban areas. Likewise, they permit carriers to establish operating terminals in suburban areas, as they may find to be expedient and convenient.

1985 Fed. Carr. Cas. at ¶ 37,198.03.

The facts in this case are similar to those in *Southwest*. Silvey's main terminal is located just across the river from its Omaha clients, and thus could be considered to be within the Omaha commercial zone.

The second prong of the test involves operational justification for movement outside the state. The ICC in *Maudlin, Oregon Public Utility Commissioner v. Southwest Delivery Co., Inc.*, 1985 Fed. Carr. Cas. (CCH) ¶ 37,198, stated that it has repeatedly recognized that operations through an operating terminal are a reasonable manner of transporting LTL traffic, even when they involve moving single-state traffic through an out-of-state terminal. The opinion cites *Pennsylvania Public Utility Comm. v. Leonard Exp.*, 107 M.C.C. 451 (1968), for the "fundamental statement of the relevant legal principal [sic] that a logical and normal operation through the carrier's headquarters or base of operations is a prime justification for an interstate routing, and counterindicatory of subterfuge to avoid State regulation." 1985 Fed. Carr. Cas. at ¶ 37,198.03. Therefore, Southwest's consolidation at the Vancouver terminal was a reasonable, normal, and logical manner of handling LTL traffic.

In this case, the issue is whether taking truckload shipments from Omaha to Silvey's Council Bluffs terminal for purposes of storage and a change of drivers is a sufficient operational justification so as not to be a subterfuge. Even if intrastate authority is granted, Silvey will continue to use its local "shag" drivers to pick up the traffic, rather than its over-the-road drivers. It has never required its over-the-road drivers to pick up loads in a local area because that would require them to be away

from their families for a longer period of time. It uses its local shag force to be more efficient.

In addition, Silvey justifies the taking of truckloads to Council Bluffs for storage purposes. Bill O'Brien, director of traffic and transportation for the Richman Gordman stores, testified that Silvey often took a loaded trailer from the Omaha distribution center to the Council Bluffs terminal and stored the product for 4 to 6 days in the trailer. This storage need is due to congested dock space at the Richman Gordman distribution center.

The third prong of the test is whether the percentage of intrastate traffic is incidental or dominant when compared to overall operations at the same terminal.

In the *Southwest* case, 698 shipments traveled single state, while 28,403 were handled in interstate commerce during the same period. The ICC found the single-state traffic was clearly incidental to Southwest's overall operations. It also found of importance the fact that even if Southwest had to obtain intrastate authority, it would continue to operate through its Vancouver terminal. "We see no better indication of defendant's good faith in this case than the lack of any persuasive reason why it should be expected to change its manner of handling the challenged single-State traffic, even if it had intrastate authority to provide the service." 1985 Fed. Carr. Cas. at ¶ 37,198.03.

The record in this case supports a finding that Silvey's interstate traffic is far more dominant than the small amount of intrastate traffic that would be involved if the application were granted.

In *Maudlin, Oregon Public Utility Commissioner v. Southwest Delivery Co., Inc.,* 1986 Fed. Carr. Cas. (CCH) ¶ 37,249, based on new evidence, Maudlin petitioned for administrative review of the appellate division 2 finding that Southwest was not engaged in intrastate commerce. Maudlin argued that portions of Southwest's traffic from Portland through the Vancouver terminal and back to Oregon were truckload (rather than LTL) in nature and, therefore, did not require movement to the Vancouver terminal. Southwest argued that even though the loads did not need to be

consolidated, they nevertheless needed to go to Vancouver for rating, billing, weighing of the trailers, and tightening and checking of the chains and bindings that secured the loads. The ICC held that this information did not change the outcome of the three-part test discussed in the first case.

Again citing *Pennsylvania P.U.C. v. Arrow Carrier Corp.*, 113 M.C.C. 213 (1971), it held:

> For the type of traffic routing involved in this proceeding, a carrier's conduct has been found lawful when the routing is reasonably direct and is employed: (a) to permit the efficient processing of traffic through a principal terminal; *or* (b) to permit consolidation of interstate and intrastate traffic to facilitate a complete service for a consignor.

(Emphasis supplied.) 1986 Fed. Carr. Cas. at ¶ 37,249.03.

Thus, it is clear that consolidation is not the only legitimate justification for hauling single-state loads out of state. In this case, the needs for a change of drivers and for storage are necessary for an efficient processing of traffic through a principal terminal.

Maudlin also argued that Southwest's rates for Oregon traffic were 25 to 27 percent below the prevailing Oregon intrastate rates, and, therefore, appellate division 2 was incorrect in characterizing the rates as " 'remarkably moderate' discounts." 1986 Fed. Carr. Cas. at ¶ 37,249.02. The ICC rejected this argument and held that Southwest may legitimately price its interstate service under federal ratemaking guidelines and that such action does not constitute a bad faith circumvention of State requirements.

We conclude that the record does not support the finding by the commission that Silvey's operations were a subterfuge, and conclude that the order to that extent must be reversed. This, however, does not establish that the denial of the application was erroneous.

The burden is upon an applicant for authority to operate as a contract carrier intrastate to show that the proposed service is specialized and is designed to meet the distinct needs of the contracting shippers; that applicant is fit, willing, and able to perform the service; and that the proposed service will be

consistent with the public interest. *Wells Fargo Armored Service Corp. v. Bankers Dispatch Corp.*, 188 Neb. 584, 198 N.W.2d 195 (1972); *Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp.*, 183 Neb. 229, 159 N.W.2d 310 (1968).

If the evidence shows that the proposed transportation by the contract carrier can be performed as well by common carriers as by contract carriers, the application should be denied. In *Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp., supra*, we held, "Where the transportation of specified commodities can be performed as well by common carriers as by contract carriers, a need for contract carriers is not established." (Syllabus of the court.)

Silvey contends that the commission erred in finding that it had failed to show a distinct need for its services that was not already being met by existing common carriers. Silvey argues that it can provide needed and specialized service to Packaging Corporation due to the close proximity of both operations. Packaging Corporation requires quick response time from a carrier to pick up loaded trailers because of its restricted dock space. Silvey is located 3 minutes away from Packaging Corporation's docks. However, the record indicates that Packaging Corporation has been able to move the three to four loads a week previously handled by Silvey by utilizing other common carriers. Packaging Corporation stated that it was possible that Bee Line and Brown could perform the same services, but in a little longer time. Both protestants have truck terminals located in Omaha, and Bee Line's Omaha terminal is located within 15 minutes' response time from Packaging Corporation's docks.

Silvey also argues that it can provide a needed and specialized service in providing "pool shipments," in which shipments for different destinations are loaded onto one truck. Bill O'Brien of Richman Gordman stores testified that on interstate shipments by Silvey, the company is forced to unload Silvey's trailers in Omaha and reload shipments for other Nebraska destinations onto their private fleet, due to Silvey's lack of intrastate authority. However, the record shows that N&W Transfer, a Nebraska common carrier with both interstate and intrastate authority, has been providing its shipping services to Richman

Gordman since 1979. In addition, both Brown and Bee Line have interstate as well as intrastate authority. O'Brien testified that he had not requested the services of either company but would have no objection to using their services, if needed, and that past use of the services has been good.

Finally, Silvey points to its needed and specialized service of storing loaded trucks at its Council Bluffs terminal until Richman Gordman is ready for delivery. O'Brien testified that this is part of the specialized service that Silvey provided. The record does not show whether other carriers could or could not provide this service.

In an appeal from an order of the Nebraska Public Service Commission, the Supreme Court examines the record to determine whether the commission acted within the scope of its authority and whether the evidence shows that the order in question was unreasonable or arbitrary. *In re Application of Renzenberger, Inc.*, 225 Neb. 30, 402 N.W.2d 294 (1987); *In re Application of Northwestern Bell Tel. Co.*, 223 Neb. 415, 390 N.W.2d 495 (1986).

From the record in this case, it cannot be said that the evidence does not support a finding that Silvey's services can be provided just as well by existing common carriers.

" ' "Whether we agree or disagree with the decision of the commission, however, is immaterial. It is not the province of this court to weigh or resolve conflicts in the evidence, or the credibility of witnesses. The Supreme Court does not act as an appellate public service commission but will sustain the action of the commission if there is evidence in the record to support it. . . ." ' "

*In re Application of McCarty*, 218 Neb. 637, 641, 358 N.W.2d 203, 206 (1984), quoting from *In re Application of ATS Mobile Telephone*, 213 Neb. 403, 330 N.W.2d 123 (1983).

Silvey next assigns as error the finding that its entry into Nebraska intrastate commerce would be significantly detrimental to the operations of Bee Line and Brown. Silvey argues that Bee Line and Brown operate predominantly as LTL carriers and that Silvey is not interested in providing LTL services. But, as the appellees point out, the scope of Silvey's application is not limited to truckload authority and, if granted,

would include LTL authority. In addition, the record indicates that Bee Line's revenue derived from service to Packaging Corporation declined by one-half when Silvey began providing its services. Thus, there is evidence to support the commission's finding that entry into the field by Silvey would be detrimental to Bee Line and Brown.

Since there is evidence to support the finding of the commission that the application should be denied, that part of the order must be affirmed.

AFFIRMED IN PART, AND IN PART REVERSED.