IN RE APPLICATION OF ROGER SLACK AND DONALD L. SLACK, DOING BUSINESS AS SLACK TRUCK LINE.
ROGER SLACK AND DONALD L. SLACK, DOING BUSINESS AS SLACK TRUCK LINE, APPELLANTS, V. SCHROETLIN TANK LINE, INC., ET AL., APPELLEES.

452 N.W.2d 538

Filed March 16, 1990.    No. 88-406.

Barry L. Hemmerling, of Jeffrey, Hahn, Hemmerling & Wade, P.C., for appellants.

Jack L. Shultz and Gregory D. Barton, of Nelson & Harding, and James E. Ryan, P.C., for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

On May 28, 1987, Roger Slack and Donald L. Slack, doing business as Slack Truck Line, filed their application with the Nebraska Public Service Commission for authority to operate as a contract carrier for Scoular-Bishop, Inc., and Double Circle Co-op of Gibbon, Nebraska, to haul fertilizer and fertilizer ingredients, including anhydrous ammonia, over irregular routes between all points in Nebraska. The applicants have no authority of any kind issued by the Public Service Commission.

Protests to the application were filed by Schroetlin Tank Line, Inc., Central Transportation Co., Inc., Wynne Transport Service, Inc., Herman Bros., Inc., Fitch Trucking, Inc., Nebraska Bulk Transports, Inc., and Wheeler Transport Service, Inc. After a hearing on September 17, 1987, the commission entered its order denying the application.

The commission found that the applicants were not fit, willing, and able to properly perform the service of a contract

carrier and that the proposed operation would not be consistent with the public interest because the transportation of the subject commodities could be performed as well by common carriers as by the contract carrier service proposed. The applicants have appealed.

The record shows that in 1980 or 1981, the applicants began hauling fertilizer for Scoular pursuant to Scoular's lease of Slacks' equipment. Under the lease, the equipment was to be the sole and exclusive property of Slacks. Possession and control of the equipment was in Scoular while Scoular was using it. Slacks had possession and the right to operate the equipment for Slacks' own use when it was not being used or operated by Scoular.

Under Slacks' lease with Scoular, Slacks provided the equipment, as well as the drivers. Slacks provided workers' compensation coverage on the drivers under the lease. Slacks withheld the drivers' federal and state income taxes and made unemployment contributions on the drivers. When questioned about the control of the equipment as provided by the lease, Roger Slack admitted Scoular's control was "not really an exclusive control."

Slacks haul 50 percent of Scoular's anhydrous ammonia and 70 to 75 percent of Scoular's liquid fertilizer. About 10 percent of Scoular's fertilizer is hauled by common carriers; the remainder is hauled by rail. Slacks cannot handle all of Scoular's fertilizer that is not hauled by rail and could not under the proposed contract. Scoular uses Central Transportation, one of the protesting carriers, to haul what Slacks cannot.

Gene Carstens, the manager of Scoular's fertilizer division, testified that the fertilizer season is very short. It lasts for 3 to 5 weeks, depending on the weather. During that time, Scoular moves 20,000 to 30,000 tons of fertilizer.

Scoular has four blend plants which serve all of its other satellite plants. The blend plants operate around the clock during the peak of the fertilizer season, and trailers must be available at all hours to haul the fertilizer away because there are not sufficient storage facilities.

Slacks' drivers have keys to the plants because Scoular personnel are not available at all hours of delivery. The drivers

know where the product goes and help keep a continuous flow of the product. Carstens believes Scoular maintains its competitive edge because of the services provided by Slacks. Scoular will not give keys to other common carriers.

Scoular prefers Slacks because their operators are so familiar with its business, and there have never been problems such as spills or fertilizer being put into the wrong tank. Six years prior to trial, Scoular had these types of problems with the common carriers it used.

Scoular will continue to use Central Transportation for its portion of Scoular's business because it does a great job, but it will not use any other common carriers if Slacks' application is denied. Instead, it will haul its own product.

All of the protesting carriers have authority and equipment to haul fertilizer. The protesting carriers' witnesses testified they are not operating at capacity and that their transportation of fertilizer has decreased since 1986 because of government farm programs, customers hauling their own product, and general business slowdown. Carstens testified that Scoular's fertilizer business had declined in the past year. The protesting carriers provide the services described by Scoular and would like additional business.

In appeals from the Public Service Commission, the Supreme Court reviews the record to determine whether the commission acted within the scope of its authority and whether the commission's order was unreasonable or arbitrary. *In re Application of Koch Service*, 228 Neb. 631, 423 N.W.2d 767 (1988); *In re Application of Silvey Refrig. Carr.*, 226 Neb. 668, 414 N.W.2d 248 (1987).

> " ' " ' "Whether we agree or disagree with the decision of the commission . . . is immaterial. It is not the province of this court to weigh or resolve conflicts in the evidence, or the credibility of witnesses. The Supreme Court does not act as an appellate public service commission but will sustain the action of the commission if there is evidence in the record to support it. . . ." ' " ' "

*In re Application of Koch Service, supra* at 632-33, 423 N.W.2d at 769 (quoting *In re Application of Silvey Refrig. Carr., supra*).

Neb. Rev. Stat. § 75-311 (Reissue 1986) provides that

authority for a contract carrier will be granted if (1) the applicant is fit, willing, and able to properly perform the service of a contract carrier and to conform to statutory provisions and the requirements, rules, and regulations of the commission, and (2) the proposed operation will be consistent with the public interest by providing the services designed to meet the distinct needs of each customer or class of customers.

The applicant has the burden to establish that its proposed service is specialized and fits the needs of the proposed contracting shipper or shippers; that it is fit, willing, and able to perform the service; and that the proposed operation will be consistent with the public interest. *In re Application of Koch Service, supra.*

If the service proposed by the applicant can be performed as well by common carriers, the application should be denied because a need for a contract carrier has not been established. *In re Application of Koch Service, supra; In re Application of Silvey Refrig. Carr., supra; Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp.*, 183 Neb. 229, 159 N.W.2d 310 (1968). Accordingly, the commission must weigh the special requirements of the shipper against the adequacy of the existing common carrier service. *In re Application of Koch Service, supra.*

In this case, the specialized needs of the shipper were night delivery, the issuance of keys to drivers, ability to reroute on short notice, and immediate availability of trucks at the plants. All of the protesting carriers testified they could provide these services. Scoular had no complaints regarding the service it received from Central Transportation and had not attempted to use any of the other protesting carriers in the past 6 years.

Other evidence to consider in determining whether the grant of contract carrier authority is consistent with the public interest is the effect on protesting carriers of a grant of the application and the effect on the shippers of a denial. *In re Application of Koch Service, supra.*

Slacks contend the commission's findings and refusal to apply the "color of authority" doctrine to their operations were erroneous. Slacks claim Scoular was the shipper of its products in this case; therefore, no authority was required for it to haul

its own products. Slacks also argue that regardless of the legality of their operations with Scoular, their application should have been granted because they had been operating under color of authority. Slacks had no authority from the commission to haul fertilizer, but claim no authority is required for a grain company (Scoular) to haul its own product. Although Slacks claim their equipment had been leased to Scoular, the lease between Scoular and Slacks was illegal because Slacks had operated for a year and a half with only $1 million coverage in liability insurance when they knew $5 million was required. Slacks applied for authority to haul fertilizer only because their insurance carrier informed Slacks that they could not increase their liability coverage from $1 million to $5 million without authority.

In the present case, the color of authority doctrine was not applicable. Slacks were operating with no authority. Furthermore, the evidence shows that the applicants were aware that authority was required to haul fertilizer and anhydrous ammonia, but did not seek authority until they were no longer able to carry on operations under the lease with Scoular. The evidence also establishes that Slacks were unwilling to conform to the applicable statutes and the commission's rules, because they operated for a year and a half without the requisite amount of liability insurance. The record supports the finding by the commission that Slacks were unfit to perform the services of a contract carrier because they had not complied with the statutes and the rules of the commission and had operated for a year and a half with less than the minimum required amount of liability insurance. The Scoular lease provided that Slacks "shall provide both liability and cargo insurance," and there is no testimony by Scoular that it provided coverage if Slacks' insurance did not cover losses. Roger Slack testified that he assumed Scoular would have been liable for any losses exceeding Slacks' coverage, but he did not know whether Scoular had any insurance on the equipment. This evidence supports the commission's finding of unfitness.

The commission found that Slacks' lease with Scoular constituted carriage for hire rather than private carriage.

In determining whether a shipper's operation constitutes

private carriage or for-hire carriage, the primary factors to be considered are exclusive shipper control of the equipment and responsibility for operation of the transportation. See *Lease of Equipment and Drivers to Private Carriers*, 132 M.C.C. 756 (1982). Roger Slack testified that Scoular's control was "not really an exclusive control" of the equipment. The terms of the lease show that it was Slacks' responsibility to "keep the Equipment in good running condition . . . pay for all maintenance, repairs, licenses and . . . provide both liability and cargo insurance." The lease also provided that Slacks were to provide the drivers. The drivers were Slacks' employees. Slacks paid the drivers' workers' compensation and unemployment contributions and withheld their state and federal income taxes. This evidence supports the commission's determination that Slacks and Scoular's lease constituted for-hire transportation services.

Scoular testified that it would transport its own product if the application were denied; however, "[t]he mere fact that a shipper has a preference for a contract carrier or that it intends to conduct private carriage operations does not warrant the authorization of the proposed service." *Brown Refrigerated Exp., Inc., Contr. Car. Applic.*, 120 M.C.C. 146, 157 (1973).

The record supports the commission's finding that a grant of contract carrier authority to the applicants would not be consistent with the public interest because the protesting carriers can provide the shipper's needed services as well as can the applicants.

The judgment is affirmed.

AFFIRMED.