IN RE APPLICATION OF NEBRASKALAND LEASING & ASSOCIATES, DOING BUSINESS AS NEBRASKALAND MOVING & STORAGE. NEBRASKALAND LEASING & ASSOCIATES, DOING BUSINESS AS NEBRASKALAND MOVING & STORAGE, APPELLANT AND CROSS-APPELLEE, V. BORLEY MOVING AND STORAGE, INC., ET AL., APPELLEES AND CROSS-APPELLANTS, AND ALLIED VAN LINES, INC., ET AL., APPELLEES.

578 N.W.2d 28

Filed May 8, 1998.   No. S-96-1318.

John M. Boehm for appellant.

Heidi Hornung Scherr, of Scudder Law Firm, P.C., for appellees Borley Moving and Storage et al.

White, C.J., Caporale, Wright, Connolly, Gerrard, Stephan, and McCormack, JJ.

Caporale, J.
## I. STATEMENT OF CASE
The Nebraska Public Service Commission denied the applicant-appellant, Nebraskaland Leasing & Associates, a certificate of public convenience and necessity to operate as a com-

mon carrier of household goods in Nebraska intrastate commerce. In challenging the denial to the Nebraska Court of Appeals, Nebraskaland (1) questioned the constitutional validity of the regulatory scheme imposed by Neb. Rev. Stat. §§ 75-301 through 75-322 (Reissue 1990 & Supp. 1995) and (2) asserted that the commission's factual findings are erroneous. Certain of the protestants-appellees, i.e., Borley Moving and Storage, Inc.; A-1 Metro Movers; Chieftain Van Lines, Inc.; and Andrews Van Lines, Inc., have cross-appealed, claiming the commission erred in finding that Nebraskaland is fit, willing, and able to perform the services proposed. Under our authority to regulate the caseloads of this court and the Court of Appeals, we, on our own motion, removed the matter to our docket. We affirm.

## II. SCOPE OF REVIEW

In an appeal from the Public Service Commission, an appellate court examines the record to determine whether the commission acted within the scope of its authority and whether the evidence establishes that the order in question is not unreasonable or arbitrary. *In re Application of Jantzen*, 245 Neb. 81, 511 N.W.2d 504 (1994). However, as to questions of law, an appellate court reaches its own conclusions. *State v. Hill, ante* p. 460, 577 N.W.2d 259 (1998).

## III. FACTS

Nebraskaland, in business since 1985, operates mostly as an interstate carrier of household goods, but also performs local and intrastate moves within Nebraska. It has been conducting its intrastate business since 1989 pursuant to a lease with Husker Express, Inc. While the lease agreement is entitled **"EQUIPMENT LEASE AGREEMENT,"** Nebraskaland operates as if it is leasing Husker Express' authority, notwithstanding that the agreement provides: "THIS EQUIPMENT LEASE SHALL NOT CONSTITUTE A LEASE OF AUTHORITY AND SHALL NOT BE CONSIDERED AS SUCH BETWEEN THE PARTIES."

Husker Express does not conduct any household goods moving, and since 1989 has referred all of its household goods business to Nebraskaland. Nebraskaland attracts its intrastate mov-

ing business by yellow pages advertising and receives referrals for intrastate moves from Paul Arpin Van Lines, Nebraskaland's national carrier. Intrastate moves conducted pursuant to its lease with Husker Express make up approximately 15 percent of Nebraskaland's business.

Nebraskaland owns three tractor-trailers and three straight trucks, but uses only two of the tractor-trailers when conducting business under its lease with Husker Express. Nebraskaland conducts intrastate moves on weekends without charging extra, conducts intrastate moves on holidays, and has a 500-pound minimum weight requirement. It performed approximately 40 intrastate moves from 1989 through 1996.

Nebraskaland performs intrastate moves for Concordia College. It also conducts furniture repossessions for Nebraska Furniture Mart. However, because it does not hold a certificate of public convenience and necessity for intrastate moves, Nebraskaland only picks up the furniture in Lincoln and stores it in its warehouse until Nebraska Furniture Mart sends one of its trucks from Omaha to pick it up. Mel Mullennax, a Nebraska Furniture Mart employee in charge of recovering merchandise, testified that he supports the granting of a certificate to Nebraskaland and would retain its services for intrastate moves. He also testified that Nebraska Furniture Mart has declined to hire other carriers because their rates are too high. However, Mullennax admitted that if Nebraskaland published a tariff that required it to charge the same rate as other carriers, Nebraska Furniture Mart would not hire Nebraskaland.

Terrie Hartshorn, a Nebraskaland employee, telephoned Andrews Van Lines in Norfolk on June 27, 1996, and asked if it would be able to perform a move from Norfolk to Chadron on July 5. She was told that Andrews Van Lines was totally booked until August. Todd Hartshorn, another Nebraskaland employee, telephoned protestant-appellee Pioneer Moving & Storage, Inc., on June 25, asked if it could move 4,000 pounds from Lincoln to Imperial on July 4 and 5, and was told that it could not do so until July 8. He also called protestant-appellee Ford Van Lines, Inc., on June 25 to ask the same question and was told that it could possibly pick up the goods on July 5 and deliver them on July 6, but that it would cost extra because July 6 was on a

weekend. Todd Hartshorn called A-1 Metro Movers on June 25 with the same question and was told that it was booked until July 8. He also posed the same question to protestant-appellee Benson Transfer & Storage Company, which responded that there was no way it could do so and that it would need 1 month's notice. Borley Moving and Storage, when asked if it could perform a move on July 4 and 5 from Grand Island to Chadron, responded that it could not. Todd Hartshorn also asked protestant-appellee Gordon Moving & Storage Co., Inc., on June 25 if it could move 4,000 pounds from Omaha to Chadron on July 4 and 5 and was told that it could do so on July 8 at an 8,000-pound minimum rate.

Todd Hartshorn spoke with Andrews Van Lines on June 26, 1996, asked if it could move 4,000 pounds from Lincoln to Imperial on July 4 and 5, and was told that it could possibly do so on July 5. He called Chieftain Van Lines on June 27, asking if it could move 2,000 pounds intrastate on July 6 and 7, and was told that it could not. He called protestant-appellee Buck's Moving & Storage on June 27, asked if it could move 2,000 pounds intrastate on July 6 and 7, and was told that it had an 8,000-pound minimum and could not do so.

Borley Moving and Storage is engaged in the moving and storage of household goods and has authority to conduct intrastate moves in Nebraska and interstate moves in 11 midwestern states. It transported 128 intrastate shipments in 1995, making up 24.1 percent of its total revenue for 1995, and 24 in the first quarter of 1996. Borley Moving and Storage hires additional employees during the summer months to handle the increased seasonal demand. It does not generally conduct moves on weekends or on holidays.

According to its president and owner, Clayton Andrews, Andrews Van Lines runs just under 100 trucks, is in the business of household goods moving, operates in 50 states and 21 foreign countries, and performs intrastate moves of household goods in Nebraska. It conducts moves on the weekends and holidays and has 10 trucks licensed in Nebraska dedicated to intrastate hauls. Moreover, it has 70 more trucks available to be licensed in Nebraska if the demand increases. However, Andrews testified that he does not have enough business for the

10 trucks already licensed. Andrews Van Lines made over $96,000 in intrastate moves in Nebraska in 1995 and over $32,000 during the first quarter of 1996. Andrews testified that only about 2 percent of his company's total revenue is from intrastate moves.

Benson Transfer & Storage performs intrastate moves of household goods in Nebraska and has six trucks licensed for such business in Nebraska. It performs moves on weekends, but not on holidays. It hires additional employees during the summer months to handle the increased seasonal demand. Benson Transfer & Storage performed 26 intrastate moves in Nebraska in 1995, generating $58,276.30 in revenue. Only 4 to 5 percent of its revenue comes from intrastate shipments.

A-1 Metro Movers performs intrastate moves of household goods within Nebraska and has seven trucks licensed for such business. It performed 14 intrastate moves in Nebraska in 1995 and 4 during the first quarter of 1996. About 7 to 8 percent of its revenue is from intrastate Nebraska moves. A-1 Metro Movers conducts moves on the weekends, but not on holidays.

Ford Van Lines, Inc., operates worldwide, performs intrastate moves of household goods in Nebraska, and has 15 trucks licensed with the commission. It performed 33 intrastate shipments in 1995, generating about $81,000, and 8 in the first quarter of 1996, generating about $20,000. Revenue generated from intrastate household moves accounts for about 3 percent of Ford Van Lines' total revenue. It has performed moves on weekends and on holidays. Harlan H. Wiederspan, president of Ford Van Lines, testified that in his view there are more than enough intrastate household goods carriers in Lincoln and that the demand for intrastate moves in the Lincoln market has always been met. It is also his opinion that if Nebraskaland were granted authority, it would have an impact on Ford Van Lines' intrastate business, despite the fact that Nebraskaland has been operating under a leasing agreement.

Buck's Moving & Storage serves the entire State of Nebraska and has six trucks licensed with the commission. It performed over 100 intrastate shipments in 1995, generating $204,210.60. Income generated from intrastate moves makes up about 25 percent of its total revenue. Buck's Moving & Storage has per-

formed moves on holidays and weekends, but prefers not to. Norman Buck, its president, testified that he has always been able to meet customer needs and that the existing carriers are meeting the current need.

Chieftain Van Lines has interstate authority for 47 states and intrastate authority in Nebraska and Iowa, and has 8 trucks registered with the commission. It hires additional employees during the summer months to handle the increased seasonal demand. Despite advertising in the yellow pages and by direct mail, Chieftain Van Lines has not conducted an intrastate move since 1994. Dennis Leslie, its vice president, explained that when it does receive inquiries for intrastate moves, the prospective customers, after receiving a quote, comment that another company can do the move for less, and do not call back. Leslie explained that Chieftain Van Lines cannot lower its rates because it is bound by the commission's rules and regulations and tariff.

A representative of Apartment Movers of Lincoln, which has intrastate authority, stated that the company conducted 6 intrastate moves in 1995 and 12 in 1994 and that "[t]here is [sic] just not that many moves out there."

In denying Nebraskaland's application, the commission found:

> The proposed services are not required by public convenience and necessity because [Nebraskaland's] proposed operation will not serve a useful purpose responsive to public demand or need, public demand or need is currently being met by existing carriers and future demand or need will be met by existing carriers, and public demand or need cannot be served by [Nebraskaland] in a manner without endangering or impairing the operations of existing carriers.

## IV. ANALYSIS OF APPEAL

### 1. CONSTITUTIONALITY OF REGULATORY SCHEME

In the first assignment of error in its appeal, Nebraskaland questions the regulatory scheme imposed by §§ 75-301 through 75-322 and asks that these statutes regulating "household good[s] carriers in Nebraska" be declared unconstitutional. In the alternative, Nebraskaland asks that the court direct the com-

mission "to grant the certificate requested." Brief for appellant at 48.

Provocative as the claim of constitutional infirmity may be, it must be remembered that Nebraskaland initiated this proceeding by filing an application pursuant to § 75-310, requesting that the commission issue a certificate of public convenience and necessity pursuant to § 75-311. The inconsistency in the positions taken by Nebraskaland in this assignment of error is precluded by the rule that a litigant who invokes the provisions of a statute may not challenge its validity nor seek the benefit of such statute and in the same action and at the same time question its constitutionality. *State ex rel. Bellino v. Moore, ante* p. 385, 576 N.W.2d 793 (1998); *State ex rel. Sileven v. Spire,* 243 Neb. 451, 500 N.W.2d 179 (1993); *In re Dissolution of School Dist. No. 22,* 216 Neb. 89, 341 N.W.2d 918 (1983).

Thus, Nebraskaland may not in this action challenge the constitutionality of §§ 75-301 through 75-322.

## 2. FACTUAL FINDINGS

In claiming that the commission erred in its factual findings, Nebraskaland asserts that the commission wrongly found that (a) Nebraskaland did not present any evidence showing a public demand or need for its services and that the public demand or need is being met by existing carriers, and (b) granting the application would place in jeopardy the intrastate operations of the existing carriers.

### (a) Public Demand or Need

In regard to the matter of public demand or need, the relevant issue is not whether the commission erred in finding that Nebraskaland presented no evidence showing such for its services, but whether there is evidence supporting the commission's finding that Nebraskaland's proposed services are not required by public convenience and necessity.

We begin by recalling that in reviewing a decision of the commission, it is not the province of an appellate court to weigh or resolve conflicts in the evidence or the credibility of the witnesses; rather, an appellate court will sustain the decision of the commission if there is evidence in the record to support its findings. *In re Application of Jantzen,* 245 Neb. 81, 511 N.W.2d 504

(1994). If there is evidence to sustain the findings of the commission, an appellate court cannot substitute its judgment for that of the commission. *Id.* Determinations by the commission are a matter peculiarly within its expertise and involve a breadth of judgment and policy determination that will not be disturbed by an appellate court in the absence of a showing that the action of the commission was arbitrary or unreasonable. *Id.*

Section 75-311 provides, in relevant part:

> A certificate shall be issued to any qualified applicant authorizing the whole or any part of the operations covered by the application if it is found after notice and hearing that (a) the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of sections 75-301 to 75-322 and the requirements, rules, and regulations of the commission under such sections and (b) the proposed service, to the extent to be authorized by the certificate, whether regular or irregular, passenger or household goods, is or will be required by the present or future public convenience and necessity. Otherwise the application shall be denied.

In determining public convenience and necessity, the deciding factors are (1) whether the operation will serve a useful purpose responsive to a public demand or need, (2) whether this purpose can or will be served as well by existing carriers, and (3) whether it can be served by the applicant in a specified manner without endangering or impairing the operations of existing carriers contrary to the public interest. *In re Application of Kilthau,* 236 Neb. 811, 464 N.W.2d 162 (1991). The issues of public convenience and necessity are ordinarily issues of fact, and where there is evidence in the record to sustain the commission's order, an appellate court cannot find the order unreasonable and arbitrary. *Id.*

Of the three public convenience and necessity factors, not all need to be addressed, because an affirmative response to the second factor negates the need for any consideration of the first factor. Regarding public demand or need, the question of adequacy of service of existing carriers is implicit in the issue of whether public convenience and necessity demand the service of an additional carrier in the field. The existence of an ade-

quate and satisfactory service by motor carriers already in the area completely negates public need and demand for added service by another carrier. *In re Application of Kilthau, supra.*

Nebraskaland first argues that the protestants' testimony should be given little weight. In doing so, Nebraskaland cites to *Joe and Al's IGA, Inc. v. Nebraska Liquor Control Commission*, 203 Neb. 176, 181, 277 N.W.2d 693, 696 (1979), in which we, addressing protests to a liquor license, stated that "protests to be effective must be of some substance. Here, stripped of form, they were all authored and signed by citizens involved in the liquor business, competitors if you will, who simply didn't want any competition. The claim that there were too many licenses . . . has a hollow ring . . . ." We have also characterized evidence proffered by protestants-competitors in the liquor arena as "not being probative." *Marting v. Nebraska Liquor Control Comm.*, 250 Neb. 134, 144, 548 N.W.2d 326, 331 (1996).

While it is true that the protestants in the instant case had a financial interest in having Nebraskaland's application denied, they did provide relevant evidence about the nature of their own businesses and their ability and willingness to meet the demand for intrastate transportation. The obvious way to prove the existence of an adequate and satisfactory service by motor carriers already in the area is to question the existing carriers. Also, unlike an application for a liquor license, an application for a certificate of public convenience and necessity to transport household goods intrastate in Nebraska is not likely to draw protest from anyone other than existing carriers.

The evidence presented by the protestants demonstrates that the existing carriers are willing and able to meet the public demand and need for intrastate moves in Nebraska. Three of the protestants testified that they hire additional employees to handle the seasonal increase in business during the summer. Andrews testified that he does not receive enough intrastate business to keep his 10 trucks designated for that purpose busy. Wiederspan and Buck both testified that the existing authorized intrastate carriers are meeting the demand for intrastate moves. Finally, Leslie testified that despite advertising in the yellow pages and by direct mail, Chieftain Van Lines has not received any intrastate business since 1994.

It is also true, as Nebraskaland notes, that the public demand or need is in part being met because Nebraskaland is involved in serving that demand or need through its lease agreement with Husker Express. However, as the commission observed, if Nebraskaland receives a certificate, Husker Express' "authority will continue to be available to the public."

Nebraskaland nonetheless argues that the commission should have considered that Nebraskaland was operating under "color of right" and that it was therefore entitled to a presumption that public convenience and necessity require a continuance of its operations.

We begin our review of this aspect of Nebraskaland's appeal by noting that § 75-309 makes it "unlawful for any common . . . carrier . . . to engage in any intrastate operations on any public highway in Nebraska unless there is in force with respect to such common carrier a certificate of public convenience and necessity . . . issued by the commission which authorizes such operations." However, § 75-318(2) allows any regulated motor carrier or person to lease, among other things, the certificates of another regulated motor carrier, provided the commission approves the lease.

The evidence shows that Nebraskaland has been engaging in intrastate operations in Nebraska without a certificate of public convenience and necessity of its own and that although Nebraskaland acted as if it had been leasing Husker Express' authority, it has not leased Husker Express' certificate of public convenience and necessity.

In urging that it should therefore be permitted to continue its operations, Nebraskaland relies upon *Dilts Trucking, Inc. v. Peake, Inc.*, 197 Neb. 459, 249 N.W.2d 732 (1977). There, Dilts had been transporting anhydrous ammonia intrastate in Nebraska since 1972 without an intrastate certificate. However, Dilts had held a certificate of public convenience from the Interstate Commerce Commission since 1969 to transport anhydrous ammonia and honestly, but erroneously, believed that its operations were covered by that certificate. In April 1975, the commission herein informed Dilts that it was involved in intrastate commerce and that it must obtain the appropriate certificate. Dilts immediately stopped its operations and applied for

the certificate. The commission found that Dilts was fit, willing, and able to properly perform the services proposed and conform to the commission's rules and regulations, but denied its application on the ground that it failed to meet its burden of proof regarding public convenience and necessity. The commission also ruled that it was not a proper color of right case and that Dilts' illegal operations could not go unnoticed and unpenalized.

On appeal, Dilts maintained that the commission erred in failing to find that the present and future convenience and necessity required a grant of its application, arguing that the situation presented a color of right case. We wrote that

> different rules are applied in "color of right" cases than in ordinary applications for certificates of public convenience and necessity. If the [c]ommission erred in its conclusion that Dilts was not a "color of authority" case and neglected or refused to apply the law applicable to such cases, then it would appear that the [c]ommission erred in the determination of what law was applicable in the instant case, and its order would be illegal and entitle the applicant to a further hearing before the [c]ommission for a reconsideration of the evidence in the light of the correct principles of law.

*Id.* at 466-67, 249 N.W.2d at 737. We reiterated that

> *in cases such as now before the court, where the applicant seeks to obtain a lawful certificate to continue in a business which it has been operating under color of authority, we do not think [the standard analysis for determining the issue of public convenience and necessity] controls. . . .*
>
> *" 'Successful operation in the past creates a presumption that public convenience and necessity require a continuance of such operation.'* [Citation omitted.]"

(Emphasis in original.) *Id.* at 469-70, 249 N.W.2d at 738-39.

We held that the commission should have treated the matter as a color of right case, inasmuch as while Dilts was operating without a certificate, it was without knowledge that it was operating without the proper authority. In reversing the judgment and remanding the matter for further proceedings, we ruled that the commission's action

> was illegal, arbitrary, and unreasonable in light of the fact that it did not consider the application in accordance with

applicable principles of law, which are that an applicant who has been operating under color of authority need not make the same showing that an applicant who has never operated must make, and that there is a presumption that the proposed service is or will be required by the present or future public convenience and necessity.

*Id.* at 471-72, 249 N.W.2d at 739.

The color of right doctrine can apply even where an applicant has been operating without any certificate at all. For example, in *Groenewold v. Building Movers, Inc.*, 197 Neb. 187, 247 N.W.2d 629 (1976), we affirmed the decision of the commission granting a certificate to a mover of houses and other buildings who had been conducting such moves without a certificate. The applicant in *Groenewold* did not realize that a certificate was required when he conducted his illegal moves. We held that it was proper to consider evidence of past illegal operations of the applicant as evidence of public convenience and necessity where there is not willful and intentional violation.

In *Gentry Real Estate Co. v. King's Limousine Service, Inc.*, 201 Neb. 761, 272 N.W.2d 359 (1978), the applicant had operated a luxury limousine service without a certificate for as long as 2 to 3 years prior to applying for a certificate. The applicant knew that a certificate was required, but failed to apply for one because of the cost and because " 'nobody seemed to be making any, many fusses about it.' " *Id.* at 765, 272 N.W.2d at 361. We held that *King's Limousine Service, Inc.*, was "not a 'color of right' or 'color of authority' case because it is clear King was not operating under any misunderstanding as to the extent of his right or authority to provide the services in question, and he freely admitted he operated without authority to do so." *Id.* at 768, 272 N.W.2d at 363. Similarly, in *In re Application of Slack*, 234 Neb. 704, 709, 452 N.W.2d 538, 541-42 (1990), we held that the color of authority doctrine was not applicable, as the applicants "were operating with no authority[, and] the evidence shows that the applicants were aware that authority was required to haul fertilizer and anhydrous ammonia . . . ."

The above cases demonstrate that when an applicant has been illegally conducting business under a mistaken belief that its operations were legal, the color of right principles of law apply.

The applicant also must have been doing so for a sufficient period of time. *In re Application of Amsberry, Inc.*, 220 Neb. 353, 370 N.W.2d 109 (1985). However, if the applicant knew that its operations were illegal, then the color of right principles do not apply.

In the instant case, the commission found that Nebraskaland's "prior operations were not being conducted under color of authority" and that they "have no probative value on the issue of public demand or need because they are either tacitly illegal or reflect the operations of another carrier whose authority will continue to be available to the public."

The only testimony in the record regarding this issue suggests that Nebraskaland believed that it had been leasing Husker Express' authority. Also, the testimony indicates that Husker Express has been relaying all of its Nebraska intrastate business to Nebraskaland. However, in view of the lease provisions noted in part III, the commission could certainly conclude that Nebraskaland did not honestly misinterpret the agreement as a lease of Husker Express' authority.

To support its contention that the existing companies are not meeting the public demand, Nebraskaland offered the testimony of the Hartshorns, as detailed in part III. In summary, the Hartshorns testified concerning 10 telephone calls they made to existing Nebraska intrastate carriers whereby the Hartshorns asked the carriers if the carriers could perform an intrastate move. In each instance, the carrier was given about 1 week's notice, and all of the requested dates included at least one date falling on the 1996 Fourth of July weekend. Of the 10 inquiries, 5 carriers responded that they could not perform the move, 3 responded that they could perform the move 3 or 4 days after the requested dates, 1 said that it could possibly perform the move 1 day after the requested date at an increased rate due to the weekend, and 1 responded that it could possibly perform the move on 1 of the requested dates. This evidence falls short of showing that there is a public demand or need for another carrier.

### (b) Jeopardy of Other Carriers

In challenging the commission's finding that granting Nebraskaland's application would place in jeopardy the

intrastate operations of the existing carriers, Nebraskaland argues that the commission's finding is erroneous because Nebraskaland has already been operating as an intrastate carrier of household goods.

Nebraskaland has been conducting intrastate moves since 1989 pursuant to its lease agreement with Husker Express; already advertises for intrastate moves; and receives referrals for intrastate moves from its national carrier, Paul Arpin Van Lines. While there is no evidence that Husker Express will begin conducting household moves if Nebraskaland is granted its own authority, Husker Express' authority will nonetheless continue to be available to the public, and nothing would stop Husker Express from operating pursuant to its certificate. The commission should not have to assume that Husker Express will retain its certificate and do nothing with it.

In *Moore's Transfer, Inc. v. Nebraska Public Service Commission*, 198 Neb. 491, 497, 253 N.W.2d 313, 316 (1977), we wrote that "[g]eneral fears of potential diversion, as contrasted with specific evidence indicating probable harm, do not constitute proof that harm will result to competitive carriers because of an application." In that case, "there was no evidence of record to indicate what service the existing carriers could provide, as the application was unopposed." *Id.* at 494, 253 N.W.2d at 315. In the instant case, while there is ample evidence of the services existing carriers could provide, there is no specific evidence indicating probable harm, only general fears of potential diversion.

Although the addition of another certificate into the pool of available carriers would allow for more competition, there is no competent evidence supporting the commission's finding that granting a certificate would place in jeopardy the intrastate operations of the existing carriers. The testimony of Dennis R. Bauder, owner of Borley Moving and Storage, and that of Andrews regarding potential harm to their businesses assume that granting a certificate will result in the complete and total loss of their intrastate business. The question posed to Buck assumes that granting the certificate will necessarily result in the loss of intrastate business to Buck's Moving & Storage. William Cronstrom, vice president and general manager of A-1

Metro Movers, testified that granting the certificate would have an impact on its operations because it "obviously would handle less shipments . . . ." When asked if granting the certificate would impact Ford Van Lines' operations, Wiederspan answered, "[C]ertainly, it would. They are right here in Lincoln. Once they get authority, even though they are already doing it, they will be able to solicit easier, and they will be able to get more business than they are getting now." When asked if granting the certificate would impact Chieftain Van Lines' operations, Leslie answered, "I could not say." But none of the protestants provided specific evidence demonstrating how granting Nebraskaland's application would place them in jeopardy.

Thus, in this regard, the commission erred. However, in view of the evidence supporting the commission's finding that the public demand is currently being met by the existing carriers and that future demand or need will be met by such carriers, the error is harmless.

### V. RESOLUTION OF CROSS-APPEAL

The foregoing determinations make it unnecessary to consider the cross-appeal.

### VI. JUDGMENT

As first noted in part I, the decision of the commission is affirmed.

AFFIRMED.