NEBRASKA PUBLIC SERVICE COMMISSION, APPELLEE, V.
NEBRASKA PUBLIC POWER DISTRICT, APPELLANT, AND
NEBRASKA INDEPENDENT TELEPHONE ASSOCIATION ET AL.,
INTERVENORS-APPELLEES.
590 N.W. 2d 840

Filed March 19, 1999.    No. S-97-1367.

James A. Eske and Kile W. Johnson, of Barlow, Johnson, Flodman, Sutter, Guenzel & Eske, and Harold L. Hadland for appellant.

Jack L. Shultz and Gregory D. Barton, of Harding, Shultz & Downs, for intervenors-appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Appellee, the Nebraska Public Service Commission (PSC), initiated an investigation to determine whether it had jurisdiction over appellant, the Nebraska Public Power District (NPPD). The PSC determined that the NPPD was providing intrastate telecommunications services for hire as a contract

carrier and that such carriers fell within the PSC's jurisdiction. We conclude that the PSC does not have jurisdiction over telecommunications contract carriers, and therefore, we reverse, and dismiss.

## BACKGROUND

### NPPD's INTERNAL COMMUNICATIONS NETWORK

The NPPD is a public corporation and political subdivision of the State of Nebraska, *SID No. 1 v. Nebraska Pub. Power Dist.*, 253 Neb. 917, 573 N.W.2d 460 (1998), which operates an electrical utility system and generates, transmits, distributes, and sells electricity within its chartered territory, *Omaha Pub. Power Dist. v. Nebraska Dept. of Revenue*, 248 Neb. 518, 537 N.W.2d 312 (1995). To operate its electrical system, the NPPD requires an internal communications network, which is primarily designed to assist the NPPD in operating its protective equipment. The communications network is also used to transmit voice and data between the NPPD's offices. In the past, the NPPD and other utilities used 2-gigahertz band frequencies for analog microwave communications pursuant to Federal Communications Commission (FCC) licenses. However, in 1993, the FCC issued new rules providing policies and procedures for the mandatory and voluntary relocation of 2-gigahertz users to other frequencies on the spectrum. In response to the new FCC rules, the NPPD began converting its analog microwave network to a combination of digital microwave and fiber optics.

The fiber optics were integrated into the NPPD's overhead protection ground wire, or "shield wire." The high voltage lines used by the NPPD generally have three conductors, or "phase wires." A shield wire is situated above the phase wires to protect them from lightning strikes. The shield wire is metal and generally contains no fiber optics. However, since the NPPD and other utilities were required by the FCC to relinquish their 2-gigahertz microwave communications systems, shield wire manufacturers have put fiber optics on the inside of their metal shield wires. Shield wire containing fiber optics is thus able to protect phase wires from lightning strikes and transmit communications.

NORTHEAST COMMUNITY COLLEGE
DISTANCE LEARNING NETWORK

The Northeast Community College (NCC) campus is located in Norfolk, Nebraska. Through affiliation agreements with public and private schools, community organizations, municipal entities, business and industry, and other organizations, the NCC provides educational and training offerings throughout northeast Nebraska. The NCC's outreach program offers instruction to off-campus students via television, onsite instruction, and interactive video distance learning programs.

In 1994, a consulting firm was hired by secondary and post-secondary educational institutions in the northeast Nebraska area to conduct a feasibility study of the region's telecommunications needs. As a result of the study, an interactive video distance learning program was developed to deliver educational programming from the NCC to the Niobrara Valley Partnership, consisting of 13 school districts; the Northeast Nebraska Telepartnership, consisting of 8 school districts; and the Elkhorn Valley Partnership, consisting of 8 school districts. The distance learning programs were delivered to these partnerships by U S West at a cost of $18,420 per year.

However, the consulting firm's study indicated that the cost of providing distance learning programs to the South Sioux City area was prohibitive, since that area was in another local access transport area, or LATA. See Neb. Rev. Stat. § 86-802(9) (Reissue 1994). See, also, *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989) (explaining LATA's). Due in part to the toll charges involved in crossing a LATA "boundary," it was expected to cost $47,148 a year to provide distance learning programs to South Sioux City. Thus, according to the NCC's calculations, it would have cost 2.6 times more to provide distance learning programs to one site than it cost to reach 29 other sites.

During the course of the consulting firm's study, it was discovered that the NPPD was upgrading and replacing a service line running from its Norfolk substation to the IBP plant substation in Dakota City and that the shield wire in the NPPD's upgraded line would contain fiber optics. The NPPD's new fiber

optic line would cross the LATA boundary and would not be subject to toll charges.

The NCC contacted the NPPD to determine whether there would be enough reserve capacity in the NPPD's fiber optic network to accommodate the NCC's distance learning program needs. Meetings were held between the NPPD, the NCC, the city of South Sioux City, and other educational partners, and it was determined that there was enough excess capacity in the fiber optic network to transmit educational programs between Norfolk, Wayne, and South Sioux City.

The NPPD and the NCC entered into an agreement on July 29, 1996, to provide the NCC with access to the NPPD's fiber optic network between Norfolk and South Sioux City. The NCC, Wayne State College, and South Sioux City were to provide the connection from their facilities to "splice points" on the NPPD's fiber optic network. In addition, the NCC was to pay the NPPD an annual fee of $6,576 for the use of the NPPD's fiber optic network, which fee was designed to recover the NPPD's costs and would not result in any profit to the NPPD.

The NCC established a fiber optic line from its campus to a midspan splice point on the NPPD's network, and South Sioux City established a fiber optic line from its technology center to the NPPD's IBP substation in Dakota City. Wayne State College had not yet connected to the NPPD's network as of March 25, 1997, but planned to do so later that year.

### City of Norfolk's Internet Connection

The city of Norfolk's public library provides Internet access to its patrons, which patrons include a significant number of nonresidents. The city of Norfolk determined that its Internet service provider was unreliable, so it began looking for an alternative mechanism by which it could provide reliable, high-speed Internet access. The city of Norfolk also sought to develop an internal communications network linking its various offices.

The city of Norfolk discovered that the NPPD was providing the NCC and the city of South Sioux City with access to the NPPD's fiber optic network and asked the NPPD for similar

access. On February 3, 1997, the NPPD agreed to provide Norfolk with access to the NPPD's fiber optic network on substantially the same terms as the NPPD provided such access to the NCC and South Sioux City. CableCom of Norfolk would install fiber optic lines in Norfolk that linked the city's offices to develop an internal communications network. CableCom would also connect this network to the NPPD's fiber optic network. The city of Norfolk would then use South Sioux City's fiber optic line running from the NPPD's IBP substation to South Sioux City's technology center, where U S West would install a frame relay connection linking the technology center with Pioneer Internet. Pioneer Internet, a subsidiary of Longlines Phone Company, would act as the city of Norfolk's Internet service provider.

As of March 25, 1997, the only line that had been completed was the connection between the city of Norfolk and the NPPD's fiber optic network.

### PSC's Investigation

Based on the NPPD's agreements with the NCC and the city of Norfolk, the PSC, on its own motion, opened an investigation to determine whether the NPPD was offering intrastate telecommunications services on a for-hire basis, such that the NPPD would be subject to the PSC's jurisdiction. Petitions for formal intervention were then filed by the Nebraska Independent Telephone Association; Benkelman Telephone Company, Inc.; Wauneta Telephone Co.; Henderson Cooperative Telephone Co.; AT&T Communications of the Midwest, Inc.; and the Nebraska Telephone Association.

The Nebraska Telephone Association asked that the PSC address whether the NPPD was eligible to receive a certificate of public convenience and necessity, considering Neb. Rev. Stat. §§ 75-604 and 70-625 (Reissue 1996) and the federal Telecommunications Act of 1996, 47 U.S.C. §§ 151 to 614 (1994 & Supp. II 1996), and that the PSC order the NPPD to cease and desist from providing telecommunications services.

The PSC held a hearing on March 25, 1997, and concluded that it had jurisdiction over the NPPD pursuant to Neb. Rev. Stat. § 75-109 (Reissue 1996). The PSC issued an order finding

that the NPPD was providing telecommunications services to the NCC and the city of Norfolk on a for-hire basis, not as a common carrier but as a contract carrier, and that the NPPD was offering these services without a certificate of public convenience and necessity, as required by § 75-604. The PSC also found that it should seek the opinion of the Attorney General as to whether the NPPD, if granted a certificate of public convenience and necessity, could continue to provide the above-described services. Accordingly, the PSC ordered that the investigation remain open until further guidance was received from the Attorney General.

The Attorney General issued an opinion on September 4, 1997, which indicated that the NPPD lacked the statutory authority to provide telecommunications services for hire under §§ 75-604 and 70-625, and that this absence of authority precluded the PSC from issuing a certificate of public convenience and necessity to the NPPD. Att'y Gen. Op. No. 97045 (Sept. 4, 1997).

On October 20, 1997, the PSC held another hearing, this time to determine which certificated carriers, if any, would be able to offer telecommunications services in place of those services being provided by the NPPD to the NCC and the city of Norfolk, and to ascertain when a carrier could do so and at what price. After hearing evidence concerning the ability of other carriers to provide services similar to those provided by the NPPD, the PSC found that U S West could provide similar services to the NCC and South Sioux City for an annual charge of $24,300.72. The PSC likewise concluded that U S West could provide similar services to the city of Norfolk. Based on the Attorney General's opinion, the PSC also concluded that the NPPD lacked statutory authority to provide telecommunications services and ordered the NPPD to cease and desist from offering such services no later than December 31.

## ASSIGNMENTS OF ERROR

The NPPD asserts that the PSC erred in (1) finding that the NPPD was offering telecommunications services to the NCC and the city of Norfolk as a contract carrier on a for-hire basis; (2) finding that the NPPD's contracts with the NCC and the city

of Norfolk fell within the PSC's jurisdiction under § 75-109; (3) finding that the NPPD's contracts with the NCC and the city of Norfolk were invalid in the absence of a certificate of public convenience and necessity issued to the NPPD by the PSC under § 75-604; (4) concluding that public power districts do not have statutory authority to provide telecommunications services; and (5) issuing the cease and desist order without proper notice and hearing contrary to due process of law, in violation of Neb. Rev. Stat. §§ 75-134 (Reissue 1996) and 84-915 (Reissue 1994).

## SCOPE OF REVIEW

This court has held that in an appeal from a decision of the PSC, an appellate court examines the record to determine whether the PSC acted within the scope of its authority and whether the evidence shows that the order in question is unreasonable or arbitrary. See, e.g., *In re Application of Northland Transp.*, 239 Neb. 918, 479 N.W.2d 764 (1992); *Union Transfer Co. v. Bee Line Motor Freight*, 150 Neb. 280, 34 N.W.2d 363 (1948). However, this court has also held that the PSC is an "agency" within the meaning of the Administrative Procedure Act (APA) and that the APA's provisions apply to the PSC. See *Yellow Cab Co. v. Nebraska State Railway Commission*, 175 Neb. 150, 120 N.W.2d 922 (1963). In an appeal under the APA, this court's standard of review is for errors appearing on the record. Neb. Rev. Stat. § 84-918 (Reissue 1994). Accordingly, we must address which standard of review applies to appeals from the PSC.

Under Neb. Rev. Stat. § 84-919 (Reissue 1994), the APA is the exclusive means of judicial review of an agency decision in a contested case, except as otherwise provided by law. Neb. Rev. Stat. § 84-917 (Reissue 1994), which governs agency appeals to the district court, is inapplicable where other provisions of law prescribe the method of appeal. Thus, if the Legislature has provided an appellate procedure other than the APA for appeals from an administrative agency, the APA does not apply, see *R.D.B., Inc. v. Nebraska Liquor Control Comm.*, 229 Neb. 178, 425 N.W.2d 884 (1988); but to the extent that another method of appeal has not been provided, the APA controls, see § 84-919.

The Legislature has indeed provided a specific method of appeal from the PSC. See Neb. Rev. Stat. §§ 75-136 to 75-137 (Reissue 1996). Section 75-136 authorizes appeals from the PSC to the Nebraska Court of Appeals when civil penalties have not been imposed, and § 75-137 prescribes the procedure for perfecting such an appeal. However, both sections are silent as to the standard of review to be applied by an appellate court. When the APA is inapplicable because another method of appeal has been prescribed and the standard of review has not otherwise been specified, the standard of review will be to search only for errors appearing on the record. *Tri-County Landfill v. Board of Cty. Comrs.*, 247 Neb. 350, 526 N.W.2d 668 (1995). Thus, the appropriate standard of review for appeals from the PSC is a review for errors appearing on the record.

When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. See *Vinci v. Nebraska Dept. of Corr. Servs.*, 253 Neb. 423, 571 N.W.2d 53 (1997).

The meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusions independent of the determination made by the administrative agency. *Baker's Supermarkets v. State*, 248 Neb. 984, 540 N.W.2d 574 (1995).

The determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach its conclusions independent from those of the trial court. *State v. Dvorak*, 254 Neb. 87, 574 N.W.2d 492 (1998).

## ANALYSIS

The PSC concluded that it had regulatory jurisdiction over the NPPD under § 75-109 because the NPPD was acting as a telecommunications contract carrier for hire. The NPPD contends that § 75-109 does not, in and of itself, grant the PSC the power to regulate all providers of communications services for hire in Nebraska intrastate commerce. Section 75-109 states:

> [T]he [PSC] shall regulate and exercise general control *as provided by law* over all common carriers, which term is hereby defined as all carriers, including contract carriers, engaged in the transportation of freight or passengers for

hire or furnishing communication services for hire in Nebraska intrastate commerce.

(Emphasis supplied.) Thus, § 75-109 does not provide the PSC with general statutory jurisdiction over all common and contract carriers; rather, such jurisdiction may be exercised only as "provided by law."

### PROVIDED BY LAW

The phrase "provided by law" means prescribed or provided by statute. *Peile v. Skelgas, Inc.*, 242 Ill. App. 3d 500, 610 N.E.2d 813, 182 Ill. Dec. 944 (1993), *reversed on other grounds* 163 Ill. 2d 323, 645 N.E.2d 184, 206 Ill. Dec. 179 (1994); *Manchin v. Browning*, 170 W. Va. 779, 296 S.E.2d 909 (1982). See *Holzendorf v. Bell*, 606 So. 2d 645 (Fla. App. 1992). Accordingly, the PSC's statutory authority over any particular common or contract carrier must be derived from some statute other than § 75-109. To hold otherwise would be to render the phrase "provided by law" superfluous, since § 75-109 would provide general authority in and of itself. See *SID No. 1 v. Nebraska Pub. Power Dist.*, 253 Neb. 917, 922, 573 N.W.2d 460, 465 (1998) (in construing statute, "a court must attempt to give effect to all of its parts, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless; it is not within the province of a court to read anything plain, direct, and unambiguous out of a statute"). Thus, the PSC may regulate and exercise general control over common and, by definition, contract carriers, only when such authority is provided for by some statute other than § 75-109.

Accordingly, we must determine whether the Legislature has enacted statutes to regulate telecommunications contract carriers. If so, the PSC would administer such statutes and, thus, exercise regulatory and general control over such carriers, by virtue of § 75-109.

Neb. Rev. Stat. §§ 75-604 to 75-616 (Reissue 1996) and 86-801 to 86-811 (Reissue 1994) generally govern telecommunications providers in this state. These sections, by their plain language, purport to apply to all telecommunications carriers without distinction. Nonetheless, we can conclude only that the Legislature's failure to distinguish between various types of telecommunications carriers indicates that the Legislature

intended these statutes to apply only to common carriers. Indeed, if we were to interpret these sections as providing the PSC with jurisdiction over telecommunications contract carriers, they would be of doubtful constitutional validity.

### CONSTITUTIONAL LIMITATIONS ON
### CONTRACT CARRIER REGULATION

Where a statute is susceptible of two constructions, under one of which the statute is valid while under the other it is unconstitutional or of doubtful validity, that construction which gives it validity should be adopted. *Nebraska P.P. Dist. v. City of York*, 212 Neb. 747, 326 N.W.2d 22 (1982), citing *Union Stock Yards Co. v. Nebraska State Railway Commission*, 103 Neb. 224, 170 N.W. 908, *modified on other grounds* 103 Neb. 224, 172 N.W. 528 (1919). Both this court's and the U.S. Supreme Court's precedents indicate that to interpret Nebraska's telecommunications statutes as providing the PSC with the authority to regulate contract carriers as strictly as common carriers would render the statutes unconstitutional. Thus, the statutes' ambiguity must be resolved in favor of the NPPD. See, *Michigan Commission v. Duke*, 266 U.S. 570, 45 S. Ct. 191, 69 L. Ed. 445 (1925); *Frost Trucking Co. v. R. R. Com.*, 271 U.S. 583, 46 S. Ct. 605, 70 L. Ed. 1101 (1926); *Smith v. Cahoon*, 283 U.S. 553, 51 S. Ct. 582, 75 L. Ed. 1264 (1931); *Stephenson v. Binford*, 287 U.S. 251, 53 S. Ct. 181, 77 L. Ed. 288 (1932); *City of Bayard v. North Central Gas Co.*, 164 Neb. 819, 83 N.W.2d 861 (1957); *Rodgers v. Nebraska State Railway Commission*, 134 Neb. 832, 279 N.W. 800 (1938).

*Michigan Commission v. Duke, supra*; *Frost Trucking Co. v. R. R. Com., supra*; and *Smith v. Cahoon, supra*, all stand for the proposition that a contract carrier cannot be constitutionally required to meet the same standards as a common carrier. The state statute in each of these cases essentially required both private contract and common motor carriers to obtain a certificate of public convenience and necessity. In each case, the Supreme Court struck down the statute. As stated by the Court in *Michigan Commission v. Duke*, 266 U.S. at 577-78:

[I]t is beyond the power of the State by legislative fiat to convert property used exclusively in the business of a pri-

vate carrier into a public utility, or to make the owner a public carrier, for that would be taking private property for public use without just compensation, which no State can do consistently with the due process of law clause of the Fourteenth Amendment.

Likewise, as we stated in *City of Bayard v. North Central Gas Co.*, 164 Neb. at 832, 83 N.W.2d at 868:

"It is well established that the state cannot, consistent with constitutional guaranties against infringement upon private property rights, by legislative fiat or edict or by the orders of an administrative commission, arbitrarily impose the character or status of a common carrier upon a mere private carrier or other person who has not devoted his property to such a public use."

If we were to read Nebraska's statutes governing telecommunications as requiring all telecommunications providers, whether private, contract, or common, to obtain a certificate of public convenience and necessity, then those statutes would likewise be unconstitutional. Accordingly, we conclude that Nebraska's telecommunications statutes apply only to common carriers.

### PSC's CONSTITUTIONAL AUTHORITY

Nonetheless, the intervenors contend that the Legislature's failure to specifically define the phrase "contract carrier" in the telecommunications context is of no moment, since the PSC has the right to define that phrase under article IV, § 20, of the Nebraska Constitution. Article IV, § 20, states in part:

The powers and duties of [the PSC] shall include the regulation of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the [PSC] shall exercise the powers and perform the duties enumerated in this provision.

Clearly, the PSC has the inherent constitutional authority to regulate common carriers under this section. See, e.g., *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989). Indeed, we have stated that in the absence of specific legislation, the powers of the PSC, as enumerated in article IV, § 20, are absolute and unqualified. *Myers v. Blair Tel.*

Co., 194 Neb. 55, 230 N.W.2d 190 (1975); *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949).

However, the powers enumerated in article IV, § 20, apply only to common carriers. The term "common carriers," as used in article IV, § 20, is coextensive with the meaning of that phrase at common law. See, e.g., *State v. Union Stock Yards Co.*, 81 Neb. 67, 115 N.W. 627 (1908). Contract carriers were not considered common carriers at common law. See *City of Bayard v. North Central Gas Co., supra*. Thus, the PSC's constitutional authority over common carriers does not extend to contract carriers. *Kopf v. Public Telephone Co.*, 173 Neb. 96, 112 N.W.2d 521 (1962). See, also, *Consumers P. P. Dist. v. Twin Valleys P. P. Dist.*, 172 Neb. 315, 109 N.W.2d 372 (1961); *City of Bayard v. North Central Gas Co.*, 164 Neb. 819, 83 N.W.2d 861 (1957); *State v. Southern Elkhorn Telephone Co.*, 106 Neb. 342, 183 N.W.2d 562 (1921).

In the absence of constitutional authority, an administrative agency has only that power which has been granted to it by the Legislature. *Stoneman v. United Neb. Bank*, 254 Neb. 477, 577 N.W.2d 271 (1998). When the Legislature grants the PSC jurisdiction over non-common carriers, the PSC must exercise such authority completely within the statutory scheme. See, *In re Complaint of Fecht*, 216 Neb. 535, 344 N.W.2d 636 (1984); *Consumers P. P. Dist. v. Twin Valleys P. P. Dist., supra*. Moreover, the meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusions independent of the determination made by the administrative agency. *Baker's Supermarkets v. State*, 248 Neb. 984, 540 N.W.2d 574 (1995). Therefore, the intervenors' reliance on the PSC's constitutional authority in the instant case is misplaced.

We do not express any opinion as to whether the NPPD is authorized to provide telecommunications services as a contract carrier or otherwise. The dispositive fact is that the NPPD was not acting as a common carrier as determined by the PSC. Because we have already determined that the PSC's jurisdiction does not extend to telecommunications contract carriers, we conclude that the PSC lacked jurisdiction over the NPPD. Therefore, the PSC had no authority to render any order con-

cerning the NPPD. See *City of Bayard v. North Central Gas Co., supra.*

## CONCLUSION

The PSC had no jurisdiction over the NPPD. Accordingly, the PSC's orders concerning the NPPD are null and void.

REVERSED AND DISMISSED.

STEPHAN, J., not participating.