IN RE APPLICATION OF NEBRASKA PUBLIC SERVICE COMMISSION.
NEBRASKA PUBLIC SERVICE COMMISSION, APPELLEE,
v. ALIANT MIDWEST ET AL., APPELLEES, AND
U S WEST COMMUNICATIONS, INC., APPELLANT.
619 N.W.2d 809

Filed December 8, 2000.   No. S-99-582.

Tory M. Bishop and Jill Vinjamuri, of Kutak Rock, for appellant.

Jon C. Bruning, of Bruning Law Office, for appellee Cox Nebraska Telcom II, L.L.C.

HENDRY, C.J., WRIGHT, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

U S West Communications, Inc. (U S West), seeks review of an order entered by the Nebraska Public Service Commission (PSC) which directed incumbent local exchange carriers (ILECs) to comply with an order establishing multidwelling unit (MDU) regulations and a statewide policy for access to MDUs by competitive local exchange carriers (CLECs).

## SCOPE OF REVIEW

■ The appropriate standard of review for appeals from the PSC is a review for errors appearing on the record. *Nebraska Pub. Serv. Comm. v. Nebraska Pub. Power Dist.*, 256 Neb. 479, 590 N.W.2d 840 (1999).

■ When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

■ The meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusions independent of the determination made by the administrative agency. *Id.*

■ Whether a decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court. *American Employers Group v. Department of Labor, ante* p. 405, 617 N.W.2d 808 (2000).

## FACTS

Cox Nebraska Telcom II, L.L.C. (Cox), filed a formal complaint with the PSC, seeking to require U S West to give Cox

access to U S West's facilities so that Cox could provide telephone service to residents of MDUs. On its own motion, the PSC entered an order on August 25, 1998, entitled "Order Opening Investigation and Requesting Comments." The order stated that it was the intention of the PSC to determine a policy regarding access to residents of MDUs in Nebraska by CLECs. After the PSC opened its investigation, Cox withdrew its complaint against U S West.

The PSC requested that all interested persons submit comments by September 8, 1998, on the following issues: (1) Who is entitled to choose a local telephone carrier, the resident of an MDU or the building owner? Why? (2) At what point should a CLEC be given access to customers (e.g., individual apartment location, building site, property line, et cetera)? What is the appropriate point of demarcation? (3) What are the rights and responsibilities of CLECs and ILECs when the cable facilities serving an MDU are not currently wired for competition? (4) If it is necessary for an ILEC to sell a portion of the existing wiring to accommodate competitive access, how should a fair price be determined? and (5) Who should pay for the rewiring of facilities, and in what amount, if rewiring is necessary? In response, Cox, U S West, and others filed comments. The PSC held a hearing on the matter on September 14, at which hearing appearances were made on behalf of Cox, U S West, and the Community Associations Institute. After testimony was given, interested parties were given until October 14 to submit additional comments. Following the hearing, Cox and U S West filed posthearing comments. Cox also submitted a proposal to the PSC which other parties, including U S West, commented on.

On March 2, 1999, the PSC entered an order entitled "Order Establishing Statewide Policy for MDU Access." The intent of the order was to foster competition while simultaneously providing residents of MDUs with a realistic opportunity to select their preferred telecommunications provider. The stated purpose of the order was to create a uniform framework which ILECs and CLECs alike would utilize to serve residents of MDUs.

In summary, the PSC ordered ILECs to provide CLECs with unlimited access to the portion of the wire loop between a demarcation point and the newly moved minimum point of entry

(MPOE), as well as any existing campus wire. The MPOE is where the campus wire begins and is generally located at the edge of the property line. The demarcation point is the point where the telephone company's facilities end and the property owner's facilities begin. It is generally where the individual customer's inside wire connects to the campus wire. Campus wire in an MDU setting runs between the property line and each building. It includes the portion of an exchange access line circuit that commences at the MPOE and extends up to and includes the demarcation point.

At the request of a CLEC or an MDU owner, ILECs were directed to provide an MPOE at the MDU property line or at a location mutually agreeable to all parties to allow the CLEC to connect to the campus wire and serve residents. The ILEC or a mutually agreed upon third-party contractor must move the MPOE in the most expeditious and cost-effective manner possible. The CLEC or requesting property owner was directed to pay the full cost of the move of the MPOE. ILECs were to retain ownership of any portion of the loop between the demarcation point and the newly moved MPOE as well as any existing campus wire.

CLECs that connected to the MPOE were permitted to use the ILEC's campus wire for a one-time fee of 25 percent of "current" construction charges of the campus wire based on an average cost-per-foot calculation. This calculation was to be derived from a sample of recently completed ILEC construction work orders for MDUs. For 3 years after the move's completion, connecting CLECs were to contribute on an equitable and nondiscriminatory pro rata basis to the one-time 25-percent charge. Maintenance expenses were to be shared by the parties on a pro rata basis based on the percentage of customers each party serves within the affected area at the time of the maintenance and were to be completed in the most expeditious and cost-effective manner possible. Finally, the PSC ordered that exclusionary contracts and marketing agreements between telephone companies and MDU owners be prohibited except with regard to condominiums, cooperatives, and homeowners' associations.

On April 20, 1999, the PSC clarified and amended its order of March 2. The PSC stated:

While it is true that the Commission is requiring the ILEC to "share" a portion of its existing facilities, the ILEC retains complete ownership and in our opinion is adequately compensated.

The Commission's authorizing the property to be used for competitive telephone service in accordance with its deregulatory policies, when the property was already dedicated to the public use of providing telephone service, does not constitute an unconstitutional taking or physical invasion of private property.

The PSC also incorporated a "Charges and Remission Schedule" for the first 3 years from the date when the first CLEC begins serving the property. This schedule was to be administered by the ILEC.

The PSC further ordered ILECs to respond to requests for reengineering of MPOEs with a formal price quote and construction schedule within 15 business days of the request. The PSC required ILECs and CLECs to meet within 30 days of a request to determine a mutually agreeable third party for maintenance or repair. Maintenance was required to be performed within 24 hours and repairs within 4 hours of the request for service by any party.

The PSC also ordered ILECs to provide samples of recently completed MDU construction jobs or work orders to find both an average distance calculation as well as an average cost-per-foot calculation. Once both numbers were derived, the two were to be multiplied to determine the overall average cost for the MDU properties that were to be used as the "current" construction charges for MDU properties. U S West timely appeals from the order of the PSC.

## ASSIGNMENTS OF ERROR

U S West makes the following assignments of error, which we have summarized and restated: (1) The PSC erred in promulgating an order which conflicts with the requirements of 47 U.S.C. § 252 (Supp. IV 1998) and is preempted by a subsequent dispositive Federal Communications Commission (FCC) order; (2) the PSC erred in promulgating a regulation inconsistent with the specific terms of the Telecommunications Act of 1996 (1996

Act); (3) the PSC erred in failing to recognize that its order constituted a taking for purposes of the Fifth Amendment and Neb. Const. art. I, § 21; (4) the PSC erred in its interpretation of Neb. Rev. Stat. § 75-109(2) (Cum. Supp. 1998); (5) the PSC erred in failing to provide ILECs just compensation for the taking of campus wire; and (6) the PSC erred in establishing an arbitrary and capricious one-time 25-percent charge for the use of an ILEC's campus wire.

## ANALYSIS

We begin with a brief factual background of the 1996 Act and a summary of the positions of the parties as to the PSC's order of March 2, 1999. The 1996 Act fundamentally restructured local telephone markets. States were no longer permitted to enforce laws that impede competition, and ILECs were subject to a variety of duties intended to facilitate market entry. Foremost among these duties was the ILEC's obligation under 47 U.S.C. § 251(c) (Supp. IV 1998) to share its network with competitors. Under this provision, a CLEC could obtain access to an ILEC's network in three ways: (1) The CLEC could purchase local telephone services at wholesale rates for resale to end users, (2) the CLEC could lease elements of the ILEC's network " 'on an unbundled basis,' " or (3) the CLEC could interconnect its own facilities with the ILEC's network. See *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999). It is possible for an ILEC to negotiate an agreement with a CLEC without regard to the duties the ILEC would otherwise have under § 251(b) or (c); however, if private negotiations fail, either party can petition the state commission that regulates local telephone use, which arbitration is subject to § 251 and the FCC regulations promulgated thereunder. *AT&T Corp. v. Iowa Utilities Bd., supra.*

As defined by 47 U.S.C. § 153(29) (Supp. IV 1998) of the 1996 Act, the term "network element" means both "a facility or equipment used in the provision of a telecommunications service" and "features, functions, and capabilities that are provided by means of such facility or equipment." Access to network elements " 'on an unbundled basis' " means that ILECs must provide the facility or functionality of a particular element to requesting carriers, sep-

arate from the facility or functionality of other elements, for a separate fee. See *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 11 F.C.C.R. 15,499, 15,635 (1996).

Six months after the 1996 Act was passed, the FCC issued a report and order implementing the local competition provisions through a series of regulations and orders. See *id.* The FCC listed a minimum set of network elements that ILECs must provide to CLECs, established interconnection rules, and adopted a methodology for pricing network elements known as TELRIC (total element long-run incremental cost). *Id.*

Pursuant to § 252(d)(1) of the 1996 Act, the FCC promulgated 47 C.F.R. § 51.503 (1999), which sets forth the general pricing standard governing what ILECs should charge CLECs for interconnection and for furnishing of network elements on an unbundled basis. In relevant part, § 51.503 states:

> (b) An incumbent LEC's rates for each element it offers shall comply with the rate structure rules set forth in §§ 51.507 and 51.509, and shall be established, at the election of the state commission—
>
> (1) Pursuant to the forward-looking economic cost-based pricing methodology set forth in §§ 51.505 and 51.511; or
>
> (2) Consistent with the proxy ceilings and ranges set forth in § 51.513.

It appears that § 51.503(b) contains two separate requirements with respect to the rates ILECs can charge. First, the rates must comply with the rate structure standards of 47 C.F.R. §§ 51.507 and 51.509 (1999). Second, the rates must be established in compliance with either 47 C.F.R. §§ 51.505 and 51.511 (1999) or 47 C.F.R. § 51.513 (1999).

Numerous challenges to this rulemaking were filed across the country by ILECs and state utility commissions. See *AT&T Corp. v. Iowa Utilities Bd., supra.* These challenges were consolidated in the U.S. Court of Appeals for the Eighth Circuit in *Iowa Utilities Bd. v. F.C.C.,* 120 F.3d 753 (8th Cir. 1997). There, the ILECs and the state commissions argued that the primary authority to implement the local competitive provisions belonged to the states rather than to the FCC. The Eighth Circuit agreed

and vacated the pricing rules and several other aspects of the order as reaching beyond the FCC's jurisdiction. The court concluded that § 252(c)(2) and (d) of the 1996 Act gave state utility commissions exclusive authority to make pricing decisions under §§ 251 and 252, thereby depriving the FCC of any rulemaking authority in that area. The court held that the general rulemaking authority conferred by the Communications Act of 1934 extended only to interstate matters and that the FCC needed specific congressional authorization before implementing provisions of the 1996 Act addressing intrastate telecommunications.

The U.S. Supreme Court affirmed in part, and in part reversed the judgments and remanded the causes to the Eighth Circuit. See *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999). The Court held that the FCC had rulemaking authority and had jurisdiction to design a pricing methodology. Thus, the causes were remanded to the Eighth Circuit for consideration of substantive challenges to the rules.

In response to the U.S. Supreme Court's decision, the FCC entered its third report and order on November 5, 1999. See *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 15 F.C.C.R. 3696 (2000). The FCC specifically noted that § 251(c)(3) and (d)(2) require ILECs to make their facilities available at cost-based rates. The FCC also stated that if the parties were unable to negotiate a reconfigured single point of interconnection at multiunit premises, the ILEC was required to construct a single point of interconnection that would be fully accessible and suitable for use by multiple carriers. *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, supra.* Any disputes regarding the implementation of this requirement, including the provisions for compensation to the ILEC under forward-looking price principles, were to be subject to the usual dispute resolution process under § 252. *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, supra.*

On remand, in *Iowa Utilities Bd. v. F.C.C.*, 219 F.3d 744 (8th Cir. 2000), the Eighth Circuit examined the FCC's pricing provisions that pertain to the pricing of interconnection and net-

work elements utilizing a forward-looking economic cost methodology that is based on the TELRIC of the element. In part, the court concluded that the hypothetical network standard upon which the TELRIC is based violated the plain meaning of the 1996 Act. Thus, the court vacated § 51.505(b)(1). In doing so, the court stated:

> It is clear from the language of the statute that Congress intended the rates to be "based on the cost . . . of *providing the interconnection or network element,*" . . . not on the cost some imaginary carrier would incur by providing the newest, most efficient, and least cost substitute for the actual item or element which will be furnished by the existing ILEC pursuant to Congress's mandate for sharing.

*Iowa Utilities Bd.*, 219 F.3d at 750.

The Eighth Circuit then went on to further illustrate the cost that ILECs could recover from CLECs. The court stated:

> It is the cost to the ILEC of providing its existing facilities and equipment either through interconnection or by providing the specifically requested existing network elements that the competitor will in fact be obtaining for use that must be the basis for the charges. The new entrant competitor, in effect, piggybacks on the ILEC's existing facilities and equipment. It is the cost to the ILEC of providing that ride on those facilities that the statute permits the ILEC to recoup. This does not defeat the purpose of using a forward-looking methodology as the intervenors assert. Costs can be forward-looking in that they can be calculated to reflect what it will cost the ILEC in the future to furnish to the competitor those portions or capacities of the ILEC's facilities and equipment that the competitor will use including any system or component upgrading that the ILEC chooses to put in place for its own more efficient use. In our view it is the cost to the ILEC of carrying the extra burden of the competitor's traffic that Congress entitled the ILEC to recover, and to that extent, the FCC's use of an incremental cost approach does no violence to the statute.

*Iowa Utilities Bd.*, 219 F.3d at 751.

The Eighth Circuit focused on § 252(d)(1)(A)(i), which provides that rates are to be "based on the cost . . . of providing the interconnection or network element." Instead of using a mythical type of efficient telephone network, state commissions must now focus on the costs that ILECs incur as a result of providing their existing facilities and equipment to a competitor, either through interconnection or by providing the specifically requested existing network elements.

In the case at bar, U S West is an ILEC which has built and maintained an infrastructure of wires and facilities to provide telecommunications services to the State of Nebraska. It provides residences and businesses in Nebraska with access to essential local exchange facilities. Prior to January 31, 1996, U S West had installed facilities on MDU campuses all the way to the demarcation point. MDU owners were not asked to pay for any aspect of the facilities on U S West's side of the demarcation point. U S West has paid for and owns these facilities, including the campus wires.

For single-family dwellings, when a CLEC is requested to provide service, it obtains approval to bury the wire in the customer's yard up to the home. This process is simple and inexpensive. With an MDU that has multiple buildings, paved or finished common areas, parking lots, swimming pools, et cetera, the process becomes more complex and expensive.

To implement the 1996 Act, the Nebraska Legislature passed 1997 Neb. Laws, L.B. 660, codified at § 75-109, which authorized the PSC to "do all things reasonably necessary and appropriate to implement" the Act. At all relevant times, § 75-109 stated:

> [T]he commission shall regulate and exercise general control as provided by law over all common carriers . . . furnishing communication services for hire in Nebraska intrastate commerce.
>
> (2) The commission is authorized to do all things reasonably necessary and appropriate to implement the federal Telecommunications Act of 1996 . . . including section 252 of the act which establishes specific procedures for negotiation and arbitration of interconnection agreements between telecommunications companies. . . . The authority

granted to the commission pursuant to this subsection shall be broadly construed in a manner consistent with the federal Telecommunications Act of 1996.

It is not disputed between U S West and Cox that the CLECs should have unrestricted access to the wire within each building. The dispute involves the campus wire and the PSC's order that ILECs must lease the campus wire to interested CLECs at a reasonable cost. Ultimately, the question before the PSC is what is the just and reasonable rate that can be charged for a CLEC's use of U S West's facilities.

U S West proposed to the PSC that if a CLEC sought access to residents of an MDU, each building in the complex should be considered to have one demarcation point at that building. It proposed that the CLEC lease the campus wire running from the mutually-agreed-upon MPOE to the initial demarcation point at each building at an average cost-based rate. U S West claimed this would ensure that each MDU resident always had a choice of provider. U S West's proposal required the ILEC to maintain all facilities up to the demarcation point of each building and required the CLEC to pay a nonrecurring charge to install necessary facilities to connect to the network. Since the facilities surrounding each MDU differ substantially, U S West recommended that the CLEC and the ILEC utilize a bona fide request process to work through the details of how best to connect the two networks before beginning construction.

U S West claimed that once constructed, the service provider would have access to its own facility at any spot up to and including the point of connection. Each carrier would be responsible for maintaining its own facilities. U S West contended that this would ensure that any resident of an MDU could change providers at any time. It argued that Cox's proposal, which would allow access to all facilities of an MDU for 25 percent of the replacement value of the campus wire, (1) was not cost based, (2) drastically underestimated the cost of the facilities, and (3) had no relationship to any economic measure at all.

Cox asserted that the ILECs should move the demarcation point for an MDU complex to an MPOE at or near the property line to enable multiple carriers to interconnect and serve residents and that U S West had previously agreed to this proposal.

As a compromise, Cox proposed that until campus wire is fully deregulated, CLECs should pay a one-time 25-percent payment for the use of the campus wire. According to Cox, U S West's proposal would charge a recurring fee of 64 percent of the total loop rate for a 2-percent use of the total loop. This charge would equal a rate of $20 per month per customer for use of the network elements by Cox. At the time, U S West was charging each customer a fee of $18.35 per month, and Cox had proposed a rate of $17.89 per month per customer. Cox claimed that a charge of $20 would effectively kill competition in the MDU marketplace because the charge for the campus wire would exceed the actual retail cost of the service. Cox claimed that U S West had already depreciated such cost or had been paid the cost by the MDU owners.

With this background, we proceed to address U S West's assignments of error. U S West first argues that the FCC has entered an order which as a matter of law preempts the PSC's order of March 2, 1999. Specifically, U S West claims that the PSC's order is in direct conflict with the 1996 Act and the subsequent third report and order by the FCC and therefore is preempted.

The applicable portions of the 1996 Act are §§ 251 and 252. Section 251 provides in relevant part:

**(c) Additional obligations of incumbent local exchange carriers**

In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:

. . . .

**(2) Interconnection**

The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—

(A) for the transmission and routing of telephone exchange service and exchange access;

(B) at any technically feasible point within the carrier's network;

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary,

affiliate, or any other party to which the carrier provides interconnection; and

(D) on rates, terms, and conditions that are just reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

**(3) Unbundled access**

The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

Section 252 states in relevant part:

**(d) Pricing standards**

**(1) Interconnection and network element charges**

Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section—

(A) shall be—

(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

(ii) nondiscriminatory, and

(B) may include a reasonable profit.

U S West claims that paragraph 60 of the FCC's third report and order, which states that "sections 251(c)(3) and 251(d)(2) require incumbent LECs to make their facilities available at cost-based rates," is directly contrary to the language found in the PSC's order and therefore preempts the PSC's order. *In the Matter of Implementation of the Local Competition Provisions*

*of the Telecommunications Act of 1996,* 15 F.C.C.R. 3696, 3729 (2000). U S West argues that as a result of *AT&T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999), the FCC entered an order which had the effect of pre-empting the PSC's order.

U S West further argues that the PSC regulation which requires CLECs to pay a total of 25 percent of replacement costs of the campus wire as a prerequisite to serving an MDU is inadequate. It claims that the PSC failed to calculate or consider the substantial cost of installing the facilities, the historical cost of maintaining the facilities, or the location of the demarcation point, which would increase U S West's cost, and failed to consider the actual market value of the facilities once they are installed. It contends that the PSC addressed only one component of the cost and value of the facilities and ignored all the other elements of investment in the telecommunications network.

Thus, U S West asserts that any order by the PSC regarding unbundled subloops which is inconsistent with cost-based rates is preempted because it specifically conflicts with the 1996 Act and the authority of the FCC to set price regulations. It asserts that since the FCC regulation occupies the field of rate setting for the use of unbundled loops by CLECs, the PSC regulation must yield to the federal regulation.

Cox argues that U S West has mischaracterized the FCC's third report and order and that the order supports Cox's position by identifying the unbundled network elements that ILECs are required to make available under the 1996 Act. Cox claims that *AT&T Corp. v. Iowa Utilities Bd., supra,* required ILECs to offer access to subloops or portions of a loop such as campus wire at any accessible point.

Cox claims that the 1996 Act and the FCC's order reinforce the PSC's order and that the FCC's order supports the PSC's order in that it notes that competition is best served by a single point of interconnection that is fully accessible to multiple carriers upon request. Cox argues that while § 252(d)(1) sets forth the pricing standards for unbundled network elements such as campus wire, the FCC's order and the 1996 Act are clear that only a state commission can set prices for those unbundled network elements.

In summary, U S West argues that the PSC's order regarding the unbundled subloops is inconsistent with cost-based rates that are required by the FCC's order and the 1996 Act and is therefore preempted because it conflicts with the 1996 Act and the authority of the FCC to set price regulations. Cox argues that the PSC set a cost-based rate for the campus wire in accordance with the 1996 Act and the FCC's order.

The basic disagreement between the parties is the interpretation of § 252(d)(1), which sets forth the pricing standards for interconnection and network element charges. The meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusions independent of the determination made by the administrative agency. *Nebraska Pub. Serv. Comm. v. Nebraska Pub. Power Dist.*, 256 Neb. 479, 590 N.W.2d 840 (1999).

Under the 1996 Act, state commissions are given authority to decide disputes between carriers. § 251(d)(3). The FCC has determined that lack of access to unbundled subloops materially diminished a CLEC's ability to provide services that it sought to offer and that, therefore, ILECs must provide unbundled access to subloops nationwide where technically feasible. *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 15 F.C.C.R. 3696 (2000). Disputes regarding implementation, including compensation to the ILEC under forward-looking pricing principles, are subject to the dispute resolution process under § 252. *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, supra.*

The provisions of the 1996 Act set forth the pricing standards for unbundled network elements such as campus wire, but the state commissions are given the authority to set the just and reasonable rate for the interconnection of facilities and equipment. See § 252(d)(1)(A)(i). The state commissions make the determination as to what will be the just and reasonable rate based on the cost of providing the interconnection or network element. "It is the cost to the ILEC of providing its existing facilities and equipment . . . that the competitor will in fact be obtaining for use that must be the basis for the charges." *Iowa Utilities Bd. v. F.C.C.*, 219 F.3d 744, 751 (8th Cir. 2000).

It is not disputed that ILECs are required to give CLECs access to their networks or that state commissions can enforce such requirement. The dispute centers on how the ILECs are to be compensated for providing their existing facilities and equipment to the CLECs. As stated above, "[i]t is the cost to the ILEC of providing that ride on those facilities that the statute permits the ILEC to recoup." *Id.*

We therefore conclude that the PSC is given the authority to set just and reasonable rates for the interconnection of the facilities in question. The language of *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999), readily implies that the state commissions have authority to implement rates and regulations subject to the provisions of the 1996 Act and the FCC regulations promulgated thereunder. Section 252(c)(2) requires that the state commissions establish rates for interconnection services or network elements according to § 252(d). Section 252(d) specifies that prices are to be set to recover costs. Via *Iowa Utilities Bd. v. F.C.C., supra,* the Eighth Circuit has given direction as to how those rates are to be determined. Thus, the PSC's order is not preempted by the 1996 Act or the FCC's order.

U S West claims that the one-time fee of 25 percent of the construction costs for perpetual use of the property does not compensate U S West for its investment, ownership, maintenance, repair, administration, and future legal obligations. Our review is to determine whether the rates established by the PSC comply with the requirements of the 1996 Act as such requirements have been judicially interpreted.

> Congress knew it was requiring the existing ILECs to share their existing facilities and equipment with new competitors as one of its chosen methods to bring competition to local telephone service, and it expressly said that the ILECs' costs of providing those facilities and that equipment were to be recoverable by just and reasonable rates.

(Emphasis omitted.) *Iowa Utilities Bd.*, 219 F.3d at 750.

The PSC set forth several pricing standards in its March 2, 1999, order which are set forth above. U S West argues that the PSC's order contains no reasonable economic, factual, or other basis in support of its one-time fee of 25 percent of "current"

construction charges or the 3-year cap placed on charges once an MPOE is relocated. It claims there is no evidence which would support the PSC's order to divest U S West and other ILECs of their property for a 25-percent charge. U S West contends that the fee has no relationship to any valid standard governing the use of an ILEC's network by a CLEC. It claims that the percentage is not based on amount of use, number of customers served, or any other reasonable factor or evaluation, nor is it tied to any economic data regarding cost or revenue associated with the campus wire. Similarly, it argues there was not a rational basis to exempt CLECs after 3 years.

Cox argues that the PSC's order was in essence a compromise between U S West's and Cox's initial proposals. Consistent with its argument that no compensable taking has occurred, Cox asserts that U S West is being compensated a second or perhaps even a third time for its capital investment in each property. Cox points out that in Nebraska, ILECs were not compensated by property owners for the inside wire but were instead ordered to amortize the remaining undepreciated value of the investment over 8 years or "flash cut" the amount from the fiscal year operations cost. Cox argues that it initially proposed this type of solution and continues to believe that this is the most fair long-term solution but that the PSC chose a reasonable compromise.

The FCC is given the task of listing the unbundled network elements that ILECs must provide CLECs and the task of setting rules for pricing of those unbundled network elements. State commissions are given the duty to actually set the prices for those unbundled network elements. See § 251(c)(3) and (d)(1). Under § 75-109(2), the PSC is given broad power to do all things reasonably necessary and appropriate to implement the 1996 Act.

In Nebraska, the ILEC typically owns and controls the campus wire at the MDU complex. Since it is impractical and undesirable for a CLEC to purchase or install the wire, the only economically feasible option is to lease the subloop based upon a reasonable charge. Cox asserts that the charge established by the PSC was a reasonable compromise and was therefore neither arbitrary nor capricious. It claims that the PSC did not need to compensate U S West at all and that the PSC's order was a reasonable compromise.

When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Nebraska Pub. Serv. Comm. v. Nebraska Pub. Power Dist.*, 256 Neb. 479, 590 N.W.2d 840 (1999). Whether a decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court. *American Employers Group v. Department of Labor, ante* p. 405, 617 N.W.2d 808 (2000).

In reviewing a decision of the PSC, it is not the province of an appellate court to weigh or resolve conflicts in the evidence or the credibility of the witnesses; rather, an appellate court will sustain the decision of the PSC if there is evidence in the record to support its findings. *In re Application of Nebraskaland Leasing & Assocs.*, 254 Neb. 583, 578 N.W.2d 28 (1998). If there is evidence to sustain the findings of the PSC, an appellate court cannot substitute its judgment for that of the PSC. *Id.* Determinations by the PSC are a matter peculiarly within its expertise and involve a breadth of judgment and policy determination that will not be disturbed by an appellate court in the absence of a showing that the action of the PSC was arbitrary or unreasonable. *Id.*

A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis that would lead a reasonable person to the same conclusion. *Southeast Rur. Vol. Fire Dept. v. Neb. Dept. of Revenue*, 251 Neb. 852, 560 N.W.2d 436 (1997). An action taken by an administrative agency in disregard of the facts or circumstances of the case and without some basis which would lead a reasonable and honest person to the same conclusion is arbitrary and capricious as a matter of law. See *Wagner v. City of Omaha*, 236 Neb. 843, 464 N.W.2d 175 (1991). A capricious decision is one guided by fancy rather than by judgment or settled purpose; such a decision is apt to change. See *Southeast Rur. Vol. Fire Dept. v. Neb. Dept. of Revenue, supra.*

Congress has set forth the pricing standards for the rates that ILECs should charge CLECs for interconnection and for the fur-

nishing of network elements on an unbundled basis pursuant to the 1996 Act. Section 251(c) imposes an identical duty on ILECs to provide interconnection and access to network elements "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." In addition, both interconnection and unbundled network elements are made subject to the same pricing standard in § 252(d)(1). *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15,499 (1996). The FCC promulgated § 51.505, which provides:

**Forward-looking economic cost.**

(a) *In general.* The forward-looking economic cost of an element equals the sum of:

(1) The total element long-run incremental cost of the element, as described in paragraph (b); and

(2) A reasonable allocation of forward-looking common costs, as described in paragraph (c).

(b) *Total element long-run incremental cost.* The total element long-run incremental cost of an element is the forward-looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element, calculated taking as a given the incumbent LEC's provision of other elements.

(1) *Efficient network configuration.* The total element long-run incremental cost of an element should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers.

. . . .

(c) *Reasonable allocation of forward-looking common costs*—(1) *Forward-looking common costs.* Forward-looking common costs are economic costs efficiently incurred in providing a group of elements or services (which may include all elements or services provided by the incumbent LEC) that cannot be attributed directly to individual elements or services.

Section 51.505(d) sets forth the factors that may not be considered: (1) embedded costs, (2) retail costs, (3) opportunity costs, and (4) revenues to subsidize other services.

These pricing standards were examined by the Eighth Circuit in *Iowa Utilities Bd. v. F.C.C.*, 219 F.3d 744 (8th Cir. 2000). The court concluded that the FCC's use of a forward-looking cost methodology was reasonable but vacated § 51.505(b)(1). It concluded that basing the allowable charge for the use of an ILEC's existing facilities and equipment on what the costs would be if the ILEC provided the most efficient technology and configuration violated the plain meaning of the 1996 Act. The pricing standard is to be based on the cost that an ILEC will incur as a result of providing its existing facilities and equipment that will be used by the competitor. See *Iowa Utilities Bd. v. F.C.C., supra.*

The Eighth Circuit found that the term "cost," as used in the 1996 Act, did not mean historical cost. It noted, however, that the term "cost" as used in § 252(d)(1)(A)(i) was ambiguous. It is a " 'chameleon, capable of taking on different meanings, and shades of meaning, depending on the subject matter and the circumstances of each particular usage.' " *Iowa Utilities Bd.*, 219 F.3d at 751-52. State commissions are required to determine the cost that an ILEC will incur as a result of providing its existing facilities and equipment either through interconnection or by providing the specifically requested network elements. *Id.*

Here, the request by Cox involves the interconnection to the campus wire and the cost associated with its use that U S West is entitled to recover. The PSC has required Cox to pay all costs associated with the movement of the MPOE. Therefore, it is the just and reasonable rate for Cox's use of the campus wire that must be determined.

The record does not establish whether the PSC's rate for the use of the campus wire conforms to the requirements set forth in *Iowa Utilities Bd. v. F.C.C., supra*. The PSC's rate is a one-time fee of 25 percent of "current" construction charges for campus wire based upon an average cost per foot of a sample of recently completed ILEC construction work orders for MDUs. We are unable to determine whether the PSC's rate accurately sets forth the cost that U S West will incur as a result of allowing Cox to interconnect to the campus wire. As noted, such cost is a

"chameleon, capable of taking on different meanings," depending upon the circumstances. Such a determination of cost should be left to the expertise of the PSC. Therefore, the PSC should reexamine its determination in light of the requirements set forth in *Iowa Utilities Bd. v. F.C.C., supra.*

Although we are remanding the PSC's determination of cost, we will independently consider U S West's argument that the PSC's order results in an unconstitutional taking of ILEC property. U S West claims that the PSC's order is an unjust per se taking in violation of the Fifth Amendment and Neb. Const. art. I, § 21. The Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." Article I, § 21, of the Nebraska Constitution provides: "The property of no person shall be taken or damaged for public use without just compensation therefor." The language of Nebraska's Constitution prohibits both the taking and the damaging of property without just compensation. See *Bargmann v. State*, 257 Neb. 766, 600 N.W.2d 797 (1999).

In *Strom v. City of Oakland*, 255 Neb. 210, 583 N.W.2d 311 (1998), we stated that there are two discrete categories of regulatory actions that are compensable without a case-specific inquiry into the public interest and concomitant regulatory requirement nexus. The first category is where the regulation denies a landowner all economically beneficial or productive use of his or her land. See, also, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992). U S West does not argue that it has been deprived of all economically beneficial or productive use of its property. The PSC's order does not deny U S West the use of the wire. U S West retains ownership and full use of the property. The order issued by the PSC directs that the wire is to be shared between U S West and any CLEC. U S West is not prohibited from occupying the wire and is not denied the power to control use of the property. The policy order permits a CLEC to use the campus wire to provide telephone service only if the CLEC has been selected by a tenant. Until a CLEC is selected, U S West has exclusive use of the campus wire.

The other category of regulatory action is where the landowner suffers a physical invasion of his or her property. See

*Strom v. City of Oakland, supra.* See, also, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982). U S West argues that a physical taking of property occurs when the government invades the property itself or adopts a law or regulation that authorizes private parties to physically occupy or control another's property.

U S West contends that there is no state or federal statutory authority for the taking of its property as set forth in the PSC's order. It claims that the only statutes which address a CLEC's use of an ILEC's property are §§ 251 and 252 and that neither of these provisions allow the taking outlined in the PSC's order. U S West claims that the PSC's order, which requires U S West to provide CLECs with perpetual and unlimited access to property that is undisputably owned by U S West, deprives it of a fundamental element of ownership.

In *Loretto v. Teleprompter Manhattan CATV Corp., supra*, the landlord claimed that the cable television company's installation of its facilities on the landlord's property pursuant to New York law requiring a landlord to permit such installation was a constitutionally compensable taking. The Court held that the New York law requiring property owners to allow a cable company access to their property constituted a physical invasion and, thus, a per se taking under the Fifth Amendment.

In *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978), the Court examined the general principles of the takings clause of the Fifth Amendment. The Court noted that no set formula exists to determine whether compensation is constitutionally due for a government restriction of property. Ordinarily, the court must engage in "essentially ad hoc, factual inquiries." *Penn Central Transp. Co.*, 438 U.S. at 124. The inquiry is not standardless. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good. *Id.* If the physical intrusion results in a permanent physical occupation, the Court has generally found that a taking has occurred. See *Loretto v. Teleprompter Manhattan CATV Corp., supra.*

CLECs such as Cox are permitted access to serve local markets via § 251(c)(2), which provides that ILECs have a duty to "provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network." Article IV, § 20, of the Nebraska Constitution gives the PSC powers and duties, including the regulation of rates and service, and general control of common carriers as the Legislature may provide by law. With the enactment of § 75-109(2), the PSC is authorized to do all things reasonably necessary and appropriate to implement the 1996 Act. The authority granted to the PSC pursuant to § 75-109(2) is to be broadly construed in a manner consistent with the 1996 Act.

We conclude that a taking has not occurred. The PSC's order does not prevent U S West from occupying its property. The order requires that the wire be shared between U S West and other requesting CLECs. U S West is not prevented from occupying any space, nor does the order deny U S West the power to control or use the property. U S West maintains ownership of the wire, but the order requires that it must share the wire in existence with other requesting CLECs. These requirements are set forth in §§ 251 and 252. The 1996 Act requires that the ILEC shall recoup the costs of providing its facilities to the CLEC.

One of the express purposes of the 1996 Act was to extend competition into local telephone markets and to encourage CLECs to service local markets. The authority granted to the PSC pursuant to § 75-109(2) is to be broadly construed. The PSC's order authorized the property to be used for competitive telephone services in accordance with its deregulatory policy. U S West has total use of the facility unless and until another competitor is selected over it as the chosen local exchange carrier.

We have previously stated in our discussion of the factual background of the 1996 Act that local telephone markets have been fundamentally restructured. Now, ILECs are required to share their networks with competitors. See *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999). The FCC has promulgated rules and regulations relating to the 1996 Act which have been the subject of scrutiny by the federal courts. See, *id.*; *Iowa Utilities Bd. v. F.C.C.*, 219 F.3d 744 (8th Cir. 2000). Congress has effected a change in the public pol-

icy regarding the local telephone markets. The 1996 Act provides that an ILEC shall recover the cost of providing its existing facilities and equipment, and the FCC has promulgated regulations to provide for such cost. *Iowa Utilities Bd. v. F.C.C., supra.*

In *Sutter Butte Canal Co. v. R. R. Comm'n*, 279 U.S. 125, 49 S. Ct. 325, 73 L. Ed. 637 (1929), the Court held that regulation of a public utility to effectuate a reasoned and legitimate change in public policy does not constitute a compensable taking of property under the state and federal Constitutions. Similarly, the regulation of ILECs under the 1996 Act would not constitute a compensable taking. We therefore conclude that the PSC's order does not constitute a taking under the Fifth Amendment or Neb. Const. art. I, § 21.

## CONCLUSION

For the reasons set forth herein, we remand the PSC's cost determination regarding use of the campus wire for reexamination in accordance with this opinion. We affirm all other aspects of the PSC's order.

AFFIRMED IN PART, AND IN PART
REMANDED WITH DIRECTIONS.

CONNOLLY, J., not participating.